**Joan DISHMAN, Respondent,**

v.

**Gloria JOSEPH, Superintendent, Western Missouri Mental Health Center, Appellant.**

**No. WD 56376.**

Missouri Court of Appeals, Western District.

April 4, 2000.

David Lee Neuhaus, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Hugh L. Marshall, Asst. Atty. Gen., Kansas City, for respondent.

Before Presiding Judge HAROLD L. LOWENSTEIN, Senior Judge FOREST W. HANNA[1] and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Gloria Joseph, the Appointing Authority of Western Missouri Mental Health Center (WMMHC), appeals the decision of the circuit court reversing the decision of the Personnel Advisory Board (PAB) denying Joan Dishman's application for attorney's fees following her successful appeal to the PAB of a disciplinary 20–day suspension. In this Court, WMMHC asserts the PAB did not err in denying Nurse Dishman's application for attorney's fees because its decision to suspend Nurse Dishman was substantially justified and the evidence did not show a lack of good faith on its part. We find, however, that the PAB erred in effectively placing the burden on Ms. Dishman to show that the State did not act in good faith, rather than placing the burden on the State to prove that its position was substantially justified. We find that the PAB further erred in redetermining the facts concerning Nurse Dishman's suspension, since those had already been determined by the PAB in the suspension hearing, and that determination was not appealed. The only issue before the PAB on Nurse Dishman's fee application was whether WMMHC's position was substantially justified based on the facts previously found and the additional information shown at the hearing as to matters which led to its decision to suspend her. We reverse and remand so that the PAB can determine the attorney's fee issue under the proper standard, as set forth below.

## I. FACTUAL AND PROCEDURAL HISTORY

Nurse Dishman has been employed as a registered nurse with WMMHC since April 1986. In 1995, Nurse Dishman worked for WMMHC as a charge nurse at the Unit 5 Center of the hospital. According to the Director of Nursing, as a charge nurse, Nurse Dishman was responsible for all of the nursing care and for supervision of all subordinate staff on Unit 5 during her shift. Nurse Dishman worked a full-time schedule. Because she had undergone surgery in June 1995 and had only returned to work full-time in September 1995, however, she had an understanding that she would be permitted to leave work early when necessary due to fatigue.

According to the evidence adduced at Nurse Dishman's suspension hearing before the PAB, on September 26, 1995, F.G. was arrested by the police and admitted to Unit 5 for treatment of delirium and psychosis. It was known, both to the police and to WMMHC personnel, that F.G. had AIDS. During F.G.'s admission to WMMHC, F.G. was agitated and struggled a great deal, resulting in an injury around his mouth. Because of his agitation and delirium, F.G. arrived at Unit 5 in restraints and remained in restraints, but was still able to spit the blood and mucus from his mouth injury on individuals who came near him.

Because F.G. was in restraints, hospital policy required that certain procedures be followed, such as constant monitoring of the patient, hourly offers of water, range of motion exercises, bladder relief, etc. At one point during assistance, F.G. gained control of his bedpan and threw its contents on the walls of his room and on Unit 5 staff members. Due to F.G.'s aggressive and agitated behavior involving his bodily fluids, and his known AIDS condition,

1. Judge Hanna took senior status while this      case was under submission.

WMMHC personnel closed the door to his room at some time during his treatment. A psychiatric technician was always staffed outside F.G.'s door when it was closed, and the technician then observed F.G. through a window in the closed door. There was conflicting evidence as to whether Nurse Dishman was aware that the staff had closed F.G.'s door.

Although large amounts of medication were administered to F.G., his agitated and aggressive condition failed to improve. At around 1:00 p.m. on September 27, 1995, F.G.'s physician, Dr. Parrikh, expressed a concern to other members of F.G.'s treatment team, including Dr. Parrikh's supervisor, Dr. Kamal, and senior members of the nursing staff, that F.G.'s agitation and delirium may be signs of a brain infection, and this might explain why he was not responsive to the psychotropic medication. Dr. Parrikh concluded that it would be advisable to transfer F.G. to Truman Medical Center (TMC) for a spinal fluid examination.

Dr. Parrikh testified that, sometime after his discussion with team members, possibly around 1:30 p.m., he called Nurse Dishman and gave her verbal instructions to transfer F.G. to TMC, but that she refused to follow his verbal instructions. Nurse Dishman testified that, to the contrary, she never received a verbal order from Dr. Parrikh to transfer F.G., and that, while nurses are often expected to take verbal orders from physicians, verbal orders to transfer patients are not allowed. Dr. Parrikh admitted that a physician's written order in the patient's chart is required for a transfer to a different hospital.

Dr. Parrikh further testified that, after the nursing staff refused to accept his verbal order, at the advise of Dr. Kamal he placed a written order for transfer to TMC in F.G.'s chart some time between 2:15 p.m. and 2:30 p.m. that day, and gave the written transfer order to one of Nurse Dishman's subordinates. At 2:30 p.m. that

same day, Nurse Dishman left work early, as permitted, due to the fatigue caused by her prior surgery. If Dr. Parrikh was correct as to when he placed the written order to transfer in the file, it may have occurred just before or just at the time she left the hospital. Another nurse, Ida Bowen, testified that she was present at the time Dr. Parrikh made the entry for transfer in F.G.'s chart, and this did not occur until 3:00 p.m., after Nurse Dishman had left work.

John Clemmons, a medication nurse, testified that at approximately 3:30 p.m. he checked on F.G., and, at that time, there was urine dripping under F.G.'s bed onto the floor, as well as spots of dried urine on the floor. Nurse Clemmons and other staff washed F.G. and put him in clean clothing once they discovered his urine-soaked condition, and he was transferred to TMC at 4:00 p.m. Nurse Clemmons testified that F.G.'s urine-soaked condition would have been apparent to anyone looking into the room or checking on F.G. However, both Muriel Lapsley, who was WMMHC's Director of Nursing, and Dr. Parrikh, testified that they had been in F.G.'s room at 1:45 p.m. and 2:15 p.m., respectively, and that the urine-soaked condition of the bed did not exist at those times.

There was also testimony presented that F.G.'s vital signs were checked at 6 a.m. and 4 p.m., and there was conflicting testimony as to whether this was in accordance with hospital policy or whether more frequent checks should have been made, and as to whether the checks that were made were properly recorded on all of the necessary forms. There was also conflicting testimony as to whether additional p.r.n. medications should have been given, and, if so, whether administration of p.r.n. medications on a more frequent basis would have been futile since subsequent tests at TMC showed F.G. was actually suffering from viral encephalitis, a condition secondary to his AIDS, rather than psychosis.[2]

At an unspecified date after F.G.'s transfer to TMC, WMMHC received a complaint pertaining to F.G.'s treatment during his stay at the Unit 5 Center. WMMHC investigated the complaint, focusing on Nurse Dishman's involvement in F.G.'s treatment because she was the charge nurse staffed during the majority of the time F.G. was treated at the Unit 5 Center. In its investigation, WMMHC interviewed Nurse Dishman and eight other witnesses. Based on this investigation, WMMHC prepared a report. WMMHC's Board reviewed the report and, based thereon, recommended that Nurse Dishman be suspended.

On February 5, 1996, WMMHC issued a letter to Nurse Dishman, notifying her she was being suspended for 20 days without pay for failing to ensure that the nursing care provided to F.G. was rendered according to acceptable standards. The letter states in relevant part:

> The reason for your suspension is failure of an employee to provide reasonable and necessary services to a client according to the treatment plan and acceptable standards of care. As the Charge Nurse on the first shift, it is your responsibility to delegate and supervise nursing care and activities within your scope of nursing activities on 5C, 7:00 a.m. to 3:30 p.m. Specifically,
>
> 1) You failed to carry out a Physician's verbal order to transport a client to TMC [Truman Medical Center] for medical evaluation. The order was given at 1:30 p.m. You failed to carry it out. The client was transported by second shift staff at 4:00 p.m. If the client had not been taken to TMC for treatment by the next shift, serious harm to the client might have occurred.
>
> 2) The door of the seclusion room was closed which is a violation of policy for

a client in restraints. This precludes direct, continuous observation of the client.

> 3) There was no charting of the client's vital signs. The restraint and seclusion policy states that the RN shall summarize the client's behavior and condition every hour in the progress notes.
>
> 4) Special care needs of a client in restraints were not met. The restraint and seclusion policy states that meals, oral hygiene, bath, clothing change, B.M., and voided is reflected by entering the appropriate code at the time of its occurrence.
>
> > The Nursing Flow Sheet and Observation Notes for the client showed no entries by day shift
> >
> > On the Mechanical Restraint/Seclusion Flow Sheet there was only one entry showing water was offered during the eight hour shift.
> >
> > There was no charting of times clothing or bedding were changed or when the client voided. The second shift found the client's clothing, bedding and restraints were drenched with urine. There were puddles of urine on the floor and a dried puddle of what appeared to be urine. There were brownish stains on the sheets which also appeared to be dried urine. There was a dried puddle of urine by the wall also. Staff members had to bathe him and change his clothing to get him ready to go to TMC.
>
> 5) No attempts to use other interventions to enable the client to move to a less restrictive level of care were noted or documented. This is inconsistent with the nursing standards for nursing care practice and management of a client with aggressive behavior.

2. p.r.n. is an abbreviation for *pro re nata,* which is defined as "according to the circumstance of the case, or when necessary."

BLAKISTON'S GOULD MEDICAL DICTIONARY 1110 (4th ed.1979).

No [p.r.n.] medication had been given since early morning and a medication review had not been ordered by you, the Charge Nurse of the day shift. When questioned, you had no explanation as to why nothing had been done.

Nurse Dishman sought review of the suspension by WMMHC, but it refused to reverse the suspension. Nurse Dishman then appealed her 20–day suspension to the PAB.

On October 29, 1996, the PAB held a hearing on Nurse Dishman's appeal, at which the above-described evidence was adduced. On February 11, 1997, the PAB found that WMMHC did not establish that Nurse Dishman failed to provide a client with reasonable and necessary services acceptable to the standards of care in the manner charged, and that Nurse Dishman had not been suspended for good cause or for the good of the service. The PAB made the following findings of fact: (1) Nurse Dishman did not fail to carry out a physician's order as charged because Dr. Parrikh did not give a clear, direct and specific order to transfer F.G. until he delivered a written order for transfer in the patient's chart; (2) F.G. was observed at all times by the nursing staff and there was no evidence that there was a regular or consistent pattern of allowing the door to be closed, that Nurse Dishman ordered or approved the door to be closed, or that Nurse Dishman allowed F.G. to be unobserved; (3) Nurse Dishman's staff did document F.G.'s behavior and condition on a hourly basis in Progress Notes; (4) F.G. needed assistance urinating, and was found sometime after 2:30 p.m. in a urine-soaked condition, but there was no evidence that F.G. was in a urine-soaked condition for any period of time when Nurse Dishman was on her shift; (5) the p.r.n. treatment medication report shows administration of p.r.n. medication and there was no evidence that failing to give more p.r.n. medication by the nursing staff was improper, contrary to acceptable standards of care,

or that additional p.r.n. medication was necessary or beneficial; and (6) F.G.'s condition did not change while at WMMHC and a less restrictive level of care was not available. In its order, the PAB further declared:

[T]he action of the Appointing Authority in suspending Appellant, Joan Dishman, in this matter be, and is hereby disapproved. The Board orders the Appointing Authority [to] rescind the suspension with payment to Appellant of salary she lost by reason of the suspension.

After prevailing, Nurse Dishman filed an application for attorney's fees pursuant to Section 536.087 RSMo 1994. Both parties waived a hearing and submitted the issue on the record and written arguments, except that WMMHC submitted two additional affidavits for consideration. One affidavit showed that Nurse Dishman's suspension only came about after a Board of Inquiry that investigated F.G.'s care and interviewed nine witnesses, including Nurse Dishman. The other affidavit was from the Director of Medical Affairs for the Missouri Department of Mental Health, who stated that a nurse would follow a verbal order from a physician to transfer, and to not do so would be a violation of duty and probable neglect. This was contrary to the PAB's earlier finding. On August 12, 1997, the PAB denied the fee application in a written order in which it reexamined the basic charges against Nurse Dishman and determined many of them against her and in favor of WWMHC. It then found there was a reasonable basis in fact for WMMHC to have suspended Nurse Dishman, and that there was no indication WMMHC lacked good faith in taking this action.

Nurse Dishman appealed the PAB's denial of her application for attorney's fees to the circuit court. She asserted the PAB erred in denying her application for attorney's fees in two regards. First, Nurse Dishman asserts the PAB erred in requiring her to demonstrate that WMMHC had

not acted in good faith as a prerequisite to recovering attorney's fees under Section 536.087. Second, Nurse Dishman urged that the PAB erroneously attempted to redetermine the merits of her case contradictory to the findings already declared by the PAB in its earlier decision on the merits, and then denied fees based on the facts as it had redetermined them.

The circuit court reversed the PAB's ruling on attorney's fees, finding WMMHC was not substantially justified in its action against Nurse Dishman. The circuit court ordered WMMHC to pay Nurse Dishman reasonable attorney's fees of $5,500.00 and reasonable expenses of $819.50. On appeal, WMMHC asks this Court to reinstate the PAB's decision on attorney's fees.

## II. STANDARD OF REVIEW

■■■ We review the decision of the PAB, not the circuit court's judgment. Sec. 536.087 RSMo 1994; *Division of Family Services v. Cade*, 939 S.W.2d 546, 550 (Mo.App. W.D.1997). Section 536.087 requires that:

> The reviewing or appellate court's determination on any judicial review or appeal heard under this subsection shall be based solely on the record made before the agency or court below. The court may modify, reverse or reverse and remand the determination of fees and other expenses if the court finds that the award or failure to make an award of fees and other expenses, or the calculation of the amount of the award, was arbitrary and capricious, was unreasonable, was unsupported by competent and substantial evidence, or was made contrary to law or in excess of the court's or agency's jurisdiction.

Sec. 536.087.7 RSMo 1994. We defer to the PAB's findings of fact and will uphold its decision if this standard is met. *Burgdorf v. Bd. Of Police Comm'rs*, 936 S.W.2d 227, 230 (Mo.App. E.D.1996); *Ogden v. Henry*, 872 S.W.2d 608, 611 (Mo.App. W.D. 1994). In making these determinations, we consider the evidence in the light most favorable to the PAB's decision. *SGOH Acquisition v. Dep't of Mental Health*, 914 S.W.2d 402, 404 (Mo.App. W.D.1996). We determine questions of law *de novo*. *McGhee v. Dixon*, 973 S.W.2d 847, 848 (Mo. banc 1998).

## III. STANDARD FOR DETERMINING WHETHER THE STATE'S POSITION WAS SUBSTANTIALLY JUSTIFIED

WMMHC asserts that the PAB's denial of Nurse Dishman's application for attorney's fees should be affirmed because its position in suspending Nurse Dishman was substantially justified and Nurse Dishman failed to show on rebuttal that it had not acted in good faith.

■■■ Section 536.087.1 provides that a prevailing party may recover reasonable fees and expenses in civil actions or agency proceedings, "unless the court or agency finds that the position of the state was substantially justified or that special circumstances make an award unjust." Sec. 536.087.1 RSMo 1994. Thus, the key issue in determining entitlement to attorney's fees is whether the State's position was substantially justified. **The burden is on the State** to establish substantial justification. *McMahan v. Missouri Dept. of Social Services*, 980 S.W.2d 120, 126 (Mo. App. E.D.1998); *Wadley v. State Dept. of Social Services*, 895 S.W.2d 176, 180 (Mo. App. S.D.1997).

Section 536.087 does not define the term "substantially justified," and the parties disagree as to its meaning. The State argues that, in order to show its position was substantially justified, it merely has to show that it acted in good faith, or did not act in bad faith. It could meet this standard, it says, if most of its arguments had merit, even if they did not succeed or if some of its arguments were without merit. By contrast, Nurse Dishman argues that it is not incumbent on her to prove that the State lacked good faith in order to recover, although certainly a lack of good faith on the part of the State would entitle her to

attorney's fees. She asserts that, rather, the test for substantial justification is whether the State made a submissible case, and whether there was a reasonable basis for the State's position in law and in fact, and it is the State's burden to meet this standard.

Aspects of both parties' positions find some support in the case law. In *St. Joseph State Hosp. v. Soliday*, 861 S.W.2d 145 (Mo.App. W.D.1993), we were required to determine whether a hospital was substantially justified in discharging an employee. In reaching this issue, we noted that Section 536.087.7 is patterned after the Federal Equal Access to Justice Act, 28 U.S.C. § 2412 (1982) ("EAJA"), and that the intent of both the EAJA and Section 536.087 is to require agencies to carefully scrutinize agency and court proceedings and to increase the accountability of the administrative agencies. *Id.* at 147. *Accord, Hernandez v. State Bd. of Healing Arts*, 936 S.W.2d 894, 902–03 (Mo.App. W.D.1997).

■ Under the statute, our duty is to review the record made before the agency and determine whether the State's position was substantially justified. Sec. 536.087.7. Moreover, as *Soliday* notes, the fact that the employee won on the merits does not create a presumption that the State's position was not substantially justified. 861 S.W.2d at 147. Rather, *Soliday* held that Missouri would interpret the term "substantially justified" in the same manner as the United States Supreme Court interpreted and applied it under the EAJA, that is:

> The term substantially justified, " . . . is not 'justified to a high degree,' but rather, 'justified in substance or in the main' – that is justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). In other words, there must be a "reasonable basis both in law and fact," for the government's action. *Id.* Under federal law, the government must bear

the burden to defeat the claim for fees and costs [by showing] "not merely that its position was marginally reasonable; its position must be clearly reasonable, well founded in law and fact, solid though not necessarily correct." [citations omitted]. There must be an indication the defendant "lacked good faith in taking its position in this litigation." *Savage v. Toan*, 636 F.Supp. 156, 157 (W.D.Mo.1986).

*Soliday*, 861 S.W.2d at 147.

*Soliday's* interpretation of "substantially justified" has been followed in most respects in later Missouri cases. Thus, in *Hernandez v. State Bd. Of Healing Arts*, we stated:

> 'Substantial evidence' is evidence that, if believed, has probative force upon issues. [citation omitted]. The whole record is to be considered. [citation omitted]. The state's position need not be correct or even highly justified, but it must have a clearly reasonable basis in fact and law. *St. Joseph State Hosp. v. Soliday*, 861 S.W.2d 145, 147 (Mo.App. 1993). The state's position must be in good faith and capable of being reached by a reasonable person. *Id.*

936 S.W.2d at 903. *See also Wadley v. State Dept. of Social Services*, 895 S.W.2d at 179 (quoting *Soliday* ).

In *McMahan v. Missouri Dept. of Social Services*, 980 S.W.2d 120 (Mo.App. E.D.1998), the Eastern District of this Court also agreed with most aspects of *Soliday*'s interpretation of the term "substantially justified." It held, however, that *Soliday* and cases following it were in error to the extent they indicated that the claimant must show that the State acted with a lack of good faith in order for the claimant to recover attorney's fees. *McMahan*, 980 S.W.2d at 125–26. It noted that *Soliday* had relied on *Savage v. Toan*, 636 F.Supp. 156, 157 (W.D.Mo.1986), for the proposition that there must be a showing of a lack of good faith on the part of the State. *Savage* had, in turn, cited

*Keasler v. United States*, 766 F.2d 1227, 1231 (8th Cir.1985), for this proposition. As *McMahan* notes, however, *Keasler*, does not, in fact, require a finding of lack of good faith by the State. To the contrary, *Keasler* merely said that the State should not be sanctioned for "advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts." *McMahan*, 980 S.W.2d at 126, *quoting, Keasler*, 766 F.2d at 1231, n. 8.

■ Of course, *Keasler* is correct that advancing in good faith novel but credible arguments in favor of an extension or new interpretation of law is not a basis for finding that the government's position is not substantially justified. We have ourselves adopted this approach in cases such as *Melahn v. Otto*, 836 S.W.2d 525, 528 (Mo.App. W.D.1992). But, as *McMahan* noted, there is an important distinction between *Melahn*'s holding that one can advance good faith arguments for an extension or change in the law without fear of being required to pay attorney's fees, and *Savage* and *Keasler*'s holding that one must prove a lack of good faith to recover such fees.

■ *McMahan* reviewed the cases on which *Keasler* had relied, and those decided under federal law since *Keasler*, and determined that none of these authorities supported requiring the claimant to show that the government lacked good faith in order to recover attorney's fees. *McMahan*, 980 S.W.2d at 125–26. We agree. Good faith or lack thereof will often be a very relevant and important consideration in making the substantial justification determination, but proof of a lack of good faith is not a mandatory element of recovery of fees. If the legislature had intended the test for the award of fees to be whether the claimant showed that the government acted in good faith, it could have said so. Instead, it put the burden on the government to prove that its position was substantially justified. As noted, we and other courts have previously held that this

means that the State must show that it had a reasonable basis in both fact and law for its position, and that this basis was not merely marginally reasonable but clearly reasonable, although not necessarily correct. *See cases cited supra.* While this standard would largely overlap with a good faith standard, the two standards are not necessarily synonymous. This substantial justification standard, as *McMahan* notes, is the standard which Missouri and the federal courts previously applied, and is the standard which the statute requires. We agree with the Eastern District's holding in *McMahan* that, to the extent *Soliday* and our other cases suggest that "good faith" is a necessary element of determining substantial justification or that the claimant bears the burden of proof of substantial justification, they should no longer be followed.

The PAB did not correctly interpret substantial justification in this case. To the contrary, the PAB summarized the law which would govern its decision as follows in relevant respects:

> To demonstrate the absence of "substantial justification," an indication that the state lacked good faith in taking its position in the litigation **must be demonstrated**. *St. Joseph State Hosp. v. Soliday*, 861 S.W.2d 145, 147 (Mo.App. 1993). "Good faith" means honesty of purpose, lack of malice, and fidelity to one's duty or obligations. [citations omitted].

(emphasis added). Thus, the PAB relied on *Soliday* for the proposition that the claimant must demonstrate a lack of good faith on the part of the State, or else the PAB will find the State's position was substantially justified. The PAB thereby erred in determining what legal standard to apply to the facts to determine whether the State had met its burden of showing that its position was substantially justified.

## IV. APPLICATION OF "SUBSTANTIALLY JUSTIFIED" STANDARD

■ The PAB also erred in setting out the facts to which this standard should

be applied. Section 536.087:3 specifically provides that the PAB's determination on the issue of substantial justification shall be based on the record made in the agency proceeding for which fees are requested:

[A]nd on the basis of the record of any hearing the court or agency deems appropriate to determine whether an award of reasonable fees and expenses should be made, provided that any such hearing shall be limited to consideration of matters which affected the agency's decision leading to the position at issue in the fee application.

Sec. 536.087.3 RSMo 1994. Thus, the fee hearing is not to be treated as a hearing on a motion for reconsideration. Rather, at the fee hearing, the PAB could only determine whether the agency's position was substantially justified when it suspended Nurse Dishman, in light of the underlying record in the case which was decided in her favor and in light of the facts and investigation which the agency showed it considered in deciding to suspend her and in trying to uphold that suspension.

Here, however, the PAB took it upon itself to reconsider the underlying facts of the case. For example, in its decision on the suspension, the PAB found: (1) Nurse Dishman did not fail to carry out the physician's orders as charged; (2) there was no evidence Nurse Dishman ordered or approved F.G.'s door to be closed or allowed F.G. to be unobserved; (3) the charts utilized to document F.G.'s treatment contained the necessary information, including hourly progress notes; (4) there was no indication F.G. was in a urine-soaked condition until after Nurse Dishman left her shift at 2:30 p.m.

Contrary to the findings outlined above, however, the PAB, when considering WMMHC's position in the fee action, found: (1) Nurse Dishman violated her nursing duties in failing to follow the verbal order from a physician; (2) Nurse Dishman could see that F.G.'s door was closed and that he was not being constant-ly observed: (3) the appropriate flow charts were not followed during Nurse Dishman's shift; and (4) because F.G. was found in a urine-soaked condition shortly after Nurse Dishman's shift, it was reasonable for WMMHC to infer that F.G. had soiled himself during Nurse Dishman's shift.

The PAB then based its decision to deny attorney's fees on these new findings. The record of the underlying suspension proceeding did contain evidence from which the PAB **could have** made each of the latter determinations favorable to WMMHC. However, in hearing the original case it made contrary determinations, resolving credibility issues in favor of Nurse Dishman. WMMHC had an opportunity to ask for rehearing of or appeal of that determination, but chose not to do so. The resolution of these issues in favor of Nurse Dishman thus became final, and it was on this basis that she applied for attorney's fees as a prevailing party. WMMHC was thus not free to use the attorney's fee hearing as a forum to relitigate the fact issues it had previously litigated and lost when the PAB reinstated Nurse Dishman. It was bound by the PAB's prior resolution of those issues. Nurse Dishman's request for attorney's fees was not an invitation to engage in a second major litigation. *See Hernandez,* 936 S.W.2d at 902, *quoting, Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). The PAB was not free to redecide these factual and credibility issues and deny fees on the basis of these new determinations.

This does not mean, of course, that the PAB was required to find that the State's position lacked substantial justification. As noted earlier, the fact that Nurse Dishman won on the merits of her suspension does **not** create a presumption that the State's position was not substantially justified. Thus, although the State's position was determined in the underlying case to be wrong, and Nurse Dishman was reinstated, this does not necessarily mean that

the State's position was not well-founded in law and fact. Rather, in reaching its fee decision, the PAB had to take into consideration not just the facts as determined against WMMHC in the underlying case, but also how these facts reasonably may have appeared to WMMHC at the time it suspended Nurse Dishman and opposed her attempt to reverse that suspension. Also relevant was the thoroughness of WMMHC's investigation, which included interviews with Nurse Dishman and eight other witnesses. The PAB could also consider any evidence of lack of good faith, but the absence of such evidence would not be determinative.

In sum, the PAB erred in determining the legal standard to apply to the issue of substantial justification, and erred in redetermining the facts regarding the incident in question in deciding that the State's actions were substantially justified, rather than taking the facts as found in the initial decision and determining whether the State's position was clearly reasonable, well-founded in law and fact, solid although not necessarily correct. Because we cannot say as a matter of law, on this record, how the PAB would have ruled had it correctly applied the law to the facts in this manner, we remand for further proceedings consistent with this opinion.

Senior Judge FOREST W. HANNA and Judge HAROLD L. LOWENSTEIN concur.