STATE of Missouri, ex rel. Andrea
Denise PULLIAM,
Respondent,

v.

Commissioner Willard C. REINE, Administrative Hearing Commission,
State of Missouri, Defendant,

and

Missouri Board of Nursing Home
Administrators, Appellant.

No. WD 61133.

Missouri Court of Appeals,
Western District.

June 24, 2003.

John M. McFarland, Kansas City, MO, for respondent.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Daryl R. Hylton, Assistant Attorney General, Jefferson City, MO, for appellant.

Before ELLIS, C.J., HOWARD and HARDWICK, JJ.

VICTOR C. HOWARD, Judge.

The Missouri Board of Nursing Home Administrators ("the Board") appeals the judgment of the circuit court awarding attorney's fees and expenses in the amount of $23,579.79 to nursing home administrator Andrea Pulliam, pursuant to section 536.087.[1] The award was based on the court's determination that the Board failed to prove it was substantially justified in seeking to discipline Pulliam's license after the Division of Aging ("the Division") issued its decision that Pulliam had not purposely, knowingly, or recklessly abused or neglected a nursing home resident.

**Facts and Procedural Background**

Helen Morrison, an elderly resident at the George H. Nettleton Home, a nursing care facility in Kansas City, Missouri, developed a severe infection in her arm after suffering a wrist injury. The infection was so serious that tendons were visible in her wrist and her arm had to be amputated between her elbow and shoulder. As a result, a complaint was filed with the Division of Aging against the nursing home. In response to that complaint, the Division initiated an investigation into the nursing home. As a result of that investigation, three separate and distinct proceedings followed to determine whether the nursing home or its employees were at fault for Morrison's injury.

The Division of Aging initiated two proceedings. The first was to determine whether the nursing home's license should be revoked. The second proceeding was filed against Andrea Pulliam, the nursing home administrator, to determine whether she had abused or neglected Morrison. The third proceeding was initiated by the Board of Nursing Home Administrators. The purpose of the third proceeding was to determine whether Pulliam's license should be disciplined pursuant to section 344.050.2(5) RSMo 1994. The instant appeal stems from the Board's action. However, an understanding of the two earlier proceedings, and how they are related to the Board's action, is necessary in order to address the issues presented on appeal.

In 1997, Andrea Pulliam began working as the licensed nursing home administrator of the George H. Nettleton Home, a fifty-bed nursing care facility. Morrison was injured in December of 1997. On January 4, 1998, Morrison's arm was amputated. A complaint was filed with the Division, and an investigation followed.

As part of its investigation, the Division visited the nursing home for inspections and issued two notices of noncompliance against the facility. On February 2, 1998, the Division issued its first notice of noncompliance against the nursing home, alleging that the nursing home staff had neglected Morrison. The Division issued a second notice on February 11, 1998. In addition to the allegations concerning Morrison's care, the second notice alleged several violations concerning staff's failure to follow certain policies in hiring an employee. Specifically, the Division claimed that Pulliam failed to conduct a criminal background check on a new employee within the time period prescribed by section 660.317.3 [2] and also failed to check whether

---

1. Unless otherwise noted, statutory references are to RSMo 2000.

2. Section 660.317 requires the nursing home to request a criminal background check on a new employee "not later than two working

the employee was listed on the Employment Disqualification List ("EDL"), a list of individuals who are not eligible to work in nursing homes.[3] The Division further alleged that the employee was abusive to some patients at the nursing home, and other employees were aware of the abuse but did not immediately investigate or report the behavior. The employee was, however, eventually terminated.

The initial focus of the Division's investigation was to determine whether cause existed to revoke the nursing home's license. However, once the Division completed its inspections, it issued notices to two entities that are responsible for regulating the conduct of nursing home administrators. The first notice was issued to a program within the Division that is responsible for maintaining the EDL. The EDL is a list maintained by the Division pursuant to sections 198.070 and 660.315 RSMo 1994 of employees who have been finally determined to have recklessly, knowingly, or purposely abused or neglected a resident while employed at a nursing home. A second notice was issued to the Board of Nursing Home Administrators, the agency responsible for regulating Pulliam's license. The notice to the Board was required by section 198.088.4 RSMo 1994,[4] which provides that the Division must notify the appropriate licensing board when it determines that a nursing home has violated certain provisions.

After the Division issued its notices to the EDL and the Board, those entities initiated separate proceedings against Pulliam, and the Division continued its proceeding against the nursing home. Therefore, the Division's investigation had resulted in three separate proceedings—one against the nursing home and two against Pulliam.

The Division's proceeding against the nursing home was resolved first. On April 1, 1998, the Division notified the nursing home that it intended to revoke its license. The letter informed the nursing home that it could appeal the revocation or enter into a consent agreement for a probationary license. On April 28, 1998, a consent agreement was executed and the nursing home was issued a probationary license.

The EDL and Board proceedings continued simultaneously after the nursing home signed the consent agreement. First, the Division notified Pulliam on June 5, 1998, that it intended to place her name on the EDL for a period of at least eight years and that she had a right to challenge the allegations against her by requesting a state hearing within thirty days. Pulliam timely appealed.

While Pulliam's appeal was pending, the Board reviewed the Division's actions concerning the nursing home and the proposal to place Pulliam on the EDL, and voted on August 14, 1998, to refer the matter to the

---

days of hiring any person." § 660.317.3(1) RSMo Cum.Supp.1997.

**3.** Section 660.317.3(2) requires the nursing home to determine whether the employee is listed on the EDL. The EDL is a list that is maintained by the Department of Social Services, pursuant to section 198.070.12, of employees "who have been finally determined by the department pursuant to section 660.315, RSMo, to have recklessly, knowingly, or purposely abused or neglected a resident while employed in any facility."

**4.** That section provides, "Whenever the department finds upon investigation that there have been violations of the provisions of section 198.003 to 198.186, 198.200, 208.030, and 208.159, RSMo, or the standards established thereunder by any person licensed under the provisions of chapter 330, 331, 332, 334, 335, 336, 337, 338, or 344, RSMo, the department shall forward a report of its findings to the appropriate licensing or examining board for further investigation."

Attorney General's Office for possible action against Pulliam's license. On September 29, 1998, the Board filed a complaint with the Administrative Hearing Commission (AHC). On January 13, 1999, the Board filed its amended petition. In its amended complaint, the Board alleged cause to discipline Pulliam's nursing home administrator's license based on three counts: (1) the care provided by her staff to Morrison, (2) her failure to request a criminal background check on an employee pursuant to section 660.317.3(1), failure to promptly contact the Department of Social Services to check the EDL on the employee pursuant to section 660.317.3(2), and her staff's failure to report incidents of the employee's abuse and neglect of residents pursuant to section 198.070.1; and (3) her assignment of charge nurse duties to a facility resident who was a licensed practical nurse but which facility records showed had suffered short-term memory loss in violation of section 198.088.6(j). The Board's allegations in count two were not part of the EDL proceeding, while the Board's allegations in counts one and three were considered in the EDL proceeding.

After the Board filed its complaint, a two-day hearing was held on August 25 and 26, 1999, concerning the Division's allegations that Pulliam should be placed on the EDL. On September 16, 1999, Pulliam filed a motion to stay the proceedings before the Board, arguing that the Division's opinion would have "significant collateral estoppel effects" on the Board's proceeding. The motion was denied.

On April 4, 2000, the Division issued its twenty-nine-page decision reversing its proposal to place Pulliam on the EDL. The Division determined that Pulliam "did not recklessly, purposely or knowingly neglect [Morrison]." [5]

The Board received a copy of the Division's decision on April 28, 2000. The Board discussed the Division's findings and decided to proceed with its petition because it determined that its criteria for determining whether Pulliam's license should be disciplined were different from the criteria for deciding whether an employee should be placed on the EDL.

On May 15, 2000, Pulliam filed a motion to dismiss the Board's petition. Pulliam argued that the Board's claims were barred by collateral estoppel and res judicata because the proceedings before the Division resolved all allegations raised by the Board in favor of Pulliam. On January 29, 2000, a commissioner of the AHC denied the motion, determining that collateral estoppel did not preclude the Board's claims.

On July 20, 2000, Pulliam filed a petition for writ of prohibition in the Cole County Circuit Court. On November 9, 2000, the circuit court issued its writ of prohibition to the commissioner directing him to dismiss the Board's proceeding with prejudice.

On December 8, 2000, the parties filed a joint motion to dissolve the writ of prohibition because the Board had filed a dismissal of the action with prejudice. The circuit court entered an order dissolving the writ of prohibition on December 12, 2000.

Pulliam filed applications for an award of reasonable attorney's fees pursuant to section 536.087 in both the circuit court and the AHC on December 8, 2000.

---

5. After she prevailed in the proceeding before the Division, Pulliam sought attorney's fees pursuant to section 536.087. The Division denied her petition. On appeal, this court reversed, holding that Pulliam was entitled to attorney's fees of $27,750 and expenses of $1,822.83 because the Division failed to show that it was substantially justified in placing Pulliam on the EDL. *Pulliam v. State*, 96 S.W.3d 904, 908 (Mo.App. W.D.2003).

Subsequently, the AHC issued an order stating that the fees in both the Board proceeding and the writ action could be recovered with the AHC because the writ action was "related to the underlying agency action." As a result, Pulliam withdrew her petition in the circuit court.

Only a few days earlier, however, the Missouri Supreme Court handed down *Greenbriar Hills Country Club v. Director of Revenue,* 47 S.W.3d 346, 350 (Mo. banc 2001), which held that an application for attorney's fees pursuant to section 536.087.3 must be filed where the final judgment for the prevailing party is issued. In response to *Greenbriar,* the AHC issued a show cause order directing the parties to demonstrate why the application pending before the AHC should not be dismissed for lack of jurisdiction.

On April 6, 2001, Pulliam filed a motion asking to withdraw her previous withdrawal of her application for fees in the circuit court. On July 3, 2001, the circuit court issued an order granting Pulliam's motion and determining that it had subject matter jurisdiction over her application. The circuit court also stayed the fee proceeding before the AHC.

The circuit court held a hearing on Pulliam's fee petition on December 14, 2001. On April 3, 2002, the circuit court issued its judgment awarding Pulliam $23,579.79 in attorney's fees and expenses. The circuit court determined that the Board was not substantially justified in continuing its action against Pulliam after the Division issued its decision on April 4, 2001, determining that Pulliam should not be placed on the EDL. The court determined that the Board's only factual basis for its allegations was the Division's investigation.

The Board brings this appeal.

**Standard of Review**

Pursuant to section 536.087.7, [i]n reviewing an agency's or trial court's decision to award or not award attorney's fees . . ., we are required to determine whether the decision was arbitrary and capricious, was unreasonable, was unsupported by competent and substantial evidence, was made contrary to law, or was made in excess of the court's or agency's jurisdiction.

*McMahan v. Mo. Dep't of Soc. Servs., Div. of Child Support Enforcement,* 980 S.W.2d 120, 124 (Mo.App. E.D.1998); *see also State ex rel. Div. of Transp. v. Sure–Way Transp., Inc.,* 948 S.W.2d 651, 655 (Mo. App. W.D.1997). Our determination "shall be based solely on the record made before the agency or court below." § 536.087.7. We give no deference to the circuit court's determinations of law and review those *de novo. Sure–Way Transp., Inc.,* 948 S.W.2d at 655. We do, however, defer to the circuit court's findings of fact and consider the evidence in the light most favorable to the circuit court's decision. *Pulliam,* 96 S.W.3d at 906.

In its third point, the Board claims that the circuit court did not have jurisdiction to rule on Pulliam's fee application because Pulliam had dismissed her fee application and did not refile within the thirty-day time period mandated by section 536.087. We must address this argument first, because "[o]ur jurisdiction derives from that of the circuit court . . . [and][i]f the trial court does not have jurisdiction to consider the merits of a case, this court has no jurisdiction to consider an appeal therefrom." *In re Marriage of Jeffrey,* 53 S.W.3d 173, 175 (Mo.App. E.D. 2001). If we determine that the circuit court lacked jurisdiction, we must dismiss the appeal. *Begshaw v. City of Independence,* 41 S.W.3d 500, 503 (Mo.App. W.D. 2000).

Section 536.087.3 provides that a party seeking an award of attorney's fees must,

> within thirty days of a final disposition in an agency proceeding or final judgment in a civil action, submit to the court, agency or commission which rendered the final disposition or judgment an application which shows that the party is a prevailing party and is eligible to receive an award under this section.

Pulliam obtained her writ of prohibition ordering the Board to dismiss its cause with prejudice on November 9, 2000. Pulliam obtained a dismissal from the AHC on December 8, 2000. Pulliam filed fee applications in both forums on December 8, 2000, which was within the thirty-day period required by the statute.

The difficulty in this case arose when the AHC issued its order on February 13, 2001, determining that it had the authority to address Pulliam's claims for fees in both the Board action and the writ proceeding. In response to that order, Pulliam filed a voluntary withdrawal of application for attorney's fees in the circuit court. She stated that the AHC had properly ruled that the attorney's fees she incurred as a prevailing party in the writ proceeding in the circuit court were within the scope of fees and expenses that would be recovered in the proceeding before the AHC. About a week later, however, the AHC issued a show cause order directing Pulliam and the Board to show cause why the application pending before the AHC should not be dismissed in light of the Missouri Supreme

Court's decision in *Greenbriar*, 47 S.W.3d at 346.

■ The *Greenbriar* case involved a country club that appealed a decision of the AHC to the Missouri Supreme Court and obtained a favorable judgment on appeal. *Id.* at 349. Following that judgment, the country club filed fee applications with the AHC, the circuit court of Cole County, and the Missouri Supreme Court. *Id.* at 349–50. The country club was denied fees by the AHC and appealed to the Missouri Supreme Court, which initially determined that it did not have jurisdiction to address the fee issue and transferred the case to the court of appeals. *Id.* at 350. The court of appeals, however, determined that the Missouri Supreme Court was the sole entity with jurisdiction over the fee application. *Id.* The Missouri Supreme Court granted transfer and determined that, because the country club prevailed in the underlying action at the Missouri Supreme Court and not before the AHC, the Missouri Supreme Court was the proper forum to consider the fee application pursuant to section 536.087.3. *Id.* at 353. That section requires that an "application for fees must be filed where the final judgment for the prevailing party is issued." *Id.* Apparently, the AHC believed that *Greenbriar* called into question whether it had jurisdiction to determine Pulliam's fee application since she had obtained a writ of prohibition in the circuit court.[6]

---

**6.** In *Greenbriar,* the Missouri Supreme Court noted that section "536.087.3 requires the application for fees to be filed in the court, agency, or commission that rendered the final disposition or judgment for the prevailing party." 47 S.W.3d at 350. " 'A 'final' disposition in an agency proceeding or a civil action occurs whenever the decision disposes of all issues as to all parties and leaves nothing for future determination.' " *Id.* at 353 (quoting

*Davis v. Angoff,* 957 S.W.2d 340, 343 (Mo. App. W.D.1997)).

> In a section 536.087 proceeding, a party 'prevails' when obtaining a 'favorable order, decision, judgment, or dismissal in a civil action or agency proceeding.' [Section 536.085.3.] To 'prevail,' however, is not limited to a favorable judgment following a trial on the merits; it may also include obtaining a settlement, obtaining a

After the AHC issued its show cause order, the circuit court, on April 3, 2001, entered an order granting Pulliam's withdrawal of her application for fees. In response to the show cause order, however, Pulliam filed a motion for leave to withdraw her previous voluntary withdrawal of application for award of attorney's fees. Pulliam claimed that if the circuit court did not grant her motion for leave to withdraw her previous withdrawal, she could be denied a tribunal to consider her fee application. She also stated that she did not intend to pursue her application in the circuit court unless and until her application before the AHC was dismissed for lack of subject matter jurisdiction.

On July 3, 2001, the circuit court issued an order ruling on Pulliam's motion for leave to withdraw her voluntary withdrawal and also the Board's pending motion to dismiss her fee application. The court determined that it had subject matter jurisdiction to adjudicate the fee application and stated that it continued to exercise jurisdiction over the writ proceeding to ensure its previous orders were given full effect. The court held that Pulliam's voluntary withdrawal was properly denominated as a motion to withdraw the application for fees, sustained her motion for leave to withdraw, and vacated its previous order granting her motion. The court also ordered a stay of the proceedings before the AHC.

■ The Board relies on Rule 67.01 and cases interpreting the rule in arguing that the circuit court lacked jurisdiction to rule on her fee application after she filed her voluntary withdrawal, which the Board has termed a "voluntary dismissal." Rule 67.02(a) provides that "a civil action may be dismissed by the plaintiff without order of the court anytime ... prior to the introduction of evidence." "[A] plaintiff's voluntary dismissal of his or her cause under Rule 67.02(a) is effective as of the date it is filed, and 'after a case is dismissed, the trial court may take no further action and any step attempted is viewed as a nullity.'" *Shelter Mut. Ins. Co. v. Vulgamott*, 96 S.W.3d 96, 104 (Mo.App. W.D.2003) (quoting *Freeman v. Leader Nat'l Ins. Co.*, 58 S.W.3d 590, 595 (Mo.App. E.D.2001)).

According to *Greenbriar*, however, a fee application that is timely filed is part of the original cause of action and is not an

voluntary dismissal of a groundless complaint, or obtaining a favorable decision on a single issue if the issue is one of significance to the underlying case. *Id.*

The parties seem to be operating under the assumption that, under *Greenbriar*, only one forum had jurisdiction to consider Pulliam's fee application. The important distinction between *Greenbriar* and the case at bar, however, is that in *Greenbriar*, the fee applicant prevailed on appeal and, therefore, only obtained one favorable judgment. Pulliam obtained two favorable judgments, a writ of prohibition in the circuit court and a dismissal in the AHC.

A case involving a writ of prohibition is much different from a case involving a traditional appeal. The most significant difference is that "[p]rohibition is an independent proceeding to correct or prevent judicial proceedings that lack jurisdiction." *State ex rel. Am. Family Mut. Ins. Co. v. Koehr*, 832 S.W.2d 7, 8 (Mo.App. E.D.1992); *State ex rel. Amoco Oil Co. v. Ely*, 992 S.W.2d 915, 916 (Mo.App. W.D.1999). Unlike *Greenbriar*, Pulliam did not obtain an unfavorable judgment which she then appealed to the circuit court. Rather, she obtained a favorable judgment (a writ of prohibition), and then obtained a dismissal in the AHC. Given the unique set of circumstances in this case, and the fact that Pulliam obtained two favorable judgments, might it have been proper for the AHC to consider Pulliam's fee application for fees incurred in the administrative proceeding, and for the circuit court to consider the fee application for the fees she incurred in the independent writ proceeding? Our disposition of this case does not require us to answer this question.

independent cause of action. "An original application for attorney's fees and expenses timely filed under section 536.087, subsections 1 through 5, is part and parcel of this original cause of action." *Greenbriar*, 47 S.W.3d at 350. In a footnote, the court elaborated:

"An act abrogating sovereign immunity does not create a new cause of action but provides a remedy for a cause of action already existing for which redress could not be had because of the immunity." There ,is a significant distinction between the first five subsections of section 536.087 and subsections six and seven. Once fees and expenses are granted, and a determination of those fees is made in the appropriate forum, these later subsections sever an appeal of that determination into a cause of action "separate and apart from the underlying judgment on which the decision is based."

*Id.* at 350 n. 7 (citations omitted). · Accordingly, Pulliam contends that the cases interpreting Rule 67.02 would have no bearing on this case, because Pulliam's voluntary withdrawal, which the circuit court held was properly denominated a motion to withdraw the fee application, could not be considered a motion to dismiss "a civil action" under Rule 67.02. Rather, the civil action was the underlying writ proceeding that arose from the Board's case seeking to dismiss Pulliam's license.

The problem with Pulliam's argument, however, is that the parties filed a joint motion to dissolve the writ on December 8, 2000, the same day that the Board filed its dismissal with prejudice and Pulliam filed

her fee applications. The court granted the motion to dissolve on December 12, 2000.[7] The circuit court stated in its judgment granting Pulliam's motion for leave to withdraw her voluntary withdrawal that it "continues to exercise jurisdiction generally over the instant writ proceeding pursuant to [Rule 97] in order to ensure that its previous orders in this case, and the remedy effected thereby, are given full effect." However, the writ of prohibition simply ordered the Board to dismiss its case against Pulliam. The Board complied with the writ and filed a dismissal with prejudice. At that point, the writ's order had been "given full effect." The parties then filed a joint motion to dissolve the writ. At that point, the only issue remaining before the circuit court was the application for attorney's fees that Pulliam filed on December 8, 2000, and withdrew in March 2001. It is difficult to see how the court could then determine in July 2001 that it continued to exercise jurisdiction over the writ proceeding when the order in the writ had been given full effect and that writ had been dissolved.

However, seemingly there is precedent for the courts to use their equitable power to consider a fee application that was filed out of time. *See Greenbriar*, 47 S.W.3d at 354. In *Greenbriar*, the fee applicant prevailed on appeal to the Missouri Supreme Court, a decision that became final on January 2, 1997. *Id.* at 353. Our supreme court then issued its mandate on January 8, 1997, which divested the court of its jurisdiction of the case. *Id.* The country club did not file its application for fees until thirty days after the court issued its mandate, which was six days after the thirty-day filing period. *Id.* at 354. Thus,

---

**7.** The parties apparently believed that the circuit court would have jurisdiction of Pulliam's fee application because their jointly filed motion included the following statement: "notwithstanding the dissolution of the writ of

prohibition jointly requested herein, this Court remains the court that rendered the final disposition in this proceeding and AHC Case ... as contemplated by R.S.Mo. 536.087."

not only was Greenbriar's fee application not timely, but it was filed in the supreme court after the court was divested of jurisdiction of the case. *Id.*

However, the court stated that the "inherent confusion" surrounding the statute was demonstrated by the fact that the country club filed its fee applications in three forums "only six days after the true thirty-day filing period had run and after this Court had divested its jurisdiction." *Id.* Accordingly, the court, "in the interest of equity [treated] Greenbriar's improvidently overruled original application for fees as a motion to recall the Court's mandate [in the appeal] ... [and] sustain[ed] the motion and in light of the confusion treat[ed] the application as being timely filed." *Id.* at 354.

▉ In the case at bar, Pulliam timely filed fee applications in the circuit court and the AHC. The AHC then issued its order determining it had jurisdiction over all fee requests. Pulliam then withdrew her application in the circuit court on March 22, 2001, only two days after the supreme court handed down its decision in *Greenbriar.* In response to *Greenbriar,* the AHC issued its show cause order on March 30, 2001, and Pulliam filed her motion for leave to withdraw her voluntary withdrawal on April 6, 2001. Perhaps, as in *Greenbriar,* the circuit court was attempting to use its equitable powers to vacate its previous order granting Pulliam's motion to withdraw her fee application. Given the unique facts of this case, including the timing of the *Greenbriar* mandate and the resultant confusion surrounding the good faith attempts to properly file the fee application, we cannot disagree with the circuit court's decision to assume jurisdiction of the matter.

### Point I

In its first point, the Board claims that the circuit court erred in determining that the Board was not substantially justified in continuing its action to discipline Pulliam's nursing home license after the Division determined on April 4, 2001, that Pulliam's name should not be placed on the EDL. The Board claims that it was substantially justified in arguing that collateral estoppel did not preclude its action to discipline Pulliam's nursing home administrator's license because the issues presented in its action were not identical to those presented in the Division's EDL action.

Section 536.087.1 provides that:

> A party who prevails in an agency proceeding or civil action arising therefrom, brought by or against the state, shall be awarded those reasonable fees and expenses incurred by that party in the civil action or agency proceeding, unless the court or agency finds that the position of the state was substantially justified or that special circumstances make an award unjust.

▉ Our courts have interpreted the term "substantially justified" to mean that the government's action must have " 'a reasonable basis both in law and fact.' " *Greenbriar Hills Country Club,* 47 S.W.3d at 354 (quoting *Dishman v. Joseph,* 14 S.W.3d 709, 716 (Mo.App. W.D.2000)); *McMahan,* 980 S.W.2d at 125. Section 536.087 supports the public policy " 'to ensure the legitimacy and fairness of government and the law so that contests between private citizens and the government are decided on the merits of the matter and not on the costs.' " *Id.* (quoting *Wadley v. Mo. Dep't of Soc. Servs., Div. of Child Support Enforcement,* 895 S.W.2d 176, 179 (Mo.App. S.D.1995)). The government bears the burden of showing substantial justification. *Greenbriar,* 47 S.W.3d at 354. "[T]he fact that [a fee applicant] won on the merits does not create a presumption that the State's position was not sub-

stantially justified." *Dishman*, 14 S.W.3d at 716. "There is no burden for the applicant to prove [the government] acted in bad faith when arguing its position." *Greenbriar*, 47 S.W.3d at 354. Moreover, "advancing in good faith novel but credible arguments in favor of an extension or new interpretation of law is not a basis for finding that the government's position is not substantially justified." *Dishman*, 14 S.W.3d at 717.

The circuit court stated the following, inter alia, in holding that the Board was not justified in proceeding against Pulliam after the EDL decision was issued and in awarding Pulliam $23,579.79 in attorney's fees and expenses:

> The Board has failed to prove that it was substantially justified in continuing [its case] against Ms. Pulliam after April 4, 2001. On that date, the Director of the Missouri Division of Aging ("DA") issued its Decision and Order reversing the DA's earlier proposal to place [Pulliam's] name on its Employee Disqualification List, determining that Relator, contrary to the DA's original allegations and investigation report, had 'not recklessly, purposely, or knowingly neglect[ed]' a resident at a licensed nursing facility. The Board's only factual basis for initiating and continuing [its case] against ... Pulliam had been the DA's original allegations and investigation report.

We hold that the circuit court erred as a matter of law in determining that the Board was not substantially justified in seeking to discipline Pulliam's license after the Division reversed its earlier proposal to place her name on the EDL. The circuit court's judgment was based on its erroneous conclusion that the EDL proceeding resolved all of the issues in the Division's "original ... investigation report." The circuit court was correct to

state that the Division's original investigation was the only factual basis for the Board's action. However, the EDL proceeding did not resolve all of the issues raised by the Division in its original investigation. The original investigation was a general fact-finding inquiry to determine whether the nursing home or its employees had violated statutory provisions and agency regulations that govern nursing homes. As a result of that investigation, three separate proceedings followed, each designed to resolve a different issue: (1) whether the nursing home's license should be revoked; (2) whether Pulliam had abused or neglected Morrison; and (3) whether Pulliam's license should be disciplined. Of the three proceedings stemming from the Division's investigation, the scope of the EDL proceeding was the most narrow, concerned only with whether Pulliam had abused or neglected Morrison. The initial proceeding by the Division against the nursing home was much broader, focusing on whether or not the nursing home had violated various statutes and regulations and whether action against its license was justified. However, the Division's original investigation was the only factual basis for *all three proceedings*. The circuit court emphasizes the fact that the Division found in Pulliam's favor in the EDL proceeding, ignoring the fact that the Division used the same investigation reports from its earlier proceeding against the nursing home and found cause to discipline the nursing home's license. It follows that the Board could also use the same investigation reports to seek discipline against Pulliam's license, regardless of the outcome of the EDL proceeding.

The circuit court's judgment also fails to recognize that the Division was required by section 198.088.4 RSMo 1994 to notify the Board of its investigation once it determined, following its investigation, that the

nursing home had violated certain provisions concerning its license. Section 198.088.4 provides:

> Whenever the department finds upon investigation that there have been violations of sections 198.003 to 198.186 ... or the standards established thereunder by any person licensed under the provisions of chapter ... 334 ... the department shall forward a report of its findings to the appropriate licensing or examining board for further investigation.

The purpose of section 198.088 is to ensure that the Board, as the entity charged with regulating the licenses of nursing home administrators, is notified whenever the Division concludes that a nursing home has violated certain guidelines. For example, in the case at bar, the nursing home was inspected twice for licensure violations. Two reports were issued, and the Division was cited for noncompliance with two regulations. The violations were described as "Class 1," which is defined in section 198.085(1) RSMo Cum.Supp.1997 as "standards the violation of which would present either an imminent danger to the health, safety or welfare of any resident or a substantial probability that death or serious physical harm would result." Accordingly, once the Division determined that the nursing home had violated licensure regulations, it was required to notify the Board so that the Board could determine whether cause existed to discipline Pulliam's license. Pulliam now attempts to argue that the Board was not justified in continuing its action against her once the Division determined that she did not knowingly, purposely, or recklessly neglect Morrison. However, section 198.088 makes it clear that the Board's action against Pulliam is separate and distinct from the Division's proceedings against the nursing home and Pulliam. While the underlying facts were the same, the issues to be resolved were completely different. Moreover, the Board, pursuant to Chapter 344, is the only entity with the authority to enforce the licensure provisions at issue in this case.

An examination of the different standards applied by the EDL and the Board shows that the two proceedings were completely different. The EDL proceeding was applying the standard set forth in section 198.070.12, which provides: "The department shall maintain the employee disqualification list and place on the employee disqualification list the names of any persons who have been finally determined by the department pursuant to section 660.315, RSMo, to have recklessly, knowingly or purposely abused or neglected a resident while employed in any facility." As the language of the statute indicates, any employee, not simply nursing home administrators, may be placed on the EDL.

In contrast, the Board proceeding was applying the standards set forth in section 344.050.2(5) and (6), which apply exclusively to nursing home administrators, and go beyond the determination whether or not a resident has been neglected. Section 344.050.2 provides a list of thirteen grounds for which the Board may file a complaint against the holder of a license, certificate, or permit required by Chapter 344. The Board filed its petition based on subsections five and six. Subsection five provides that the Board may cause a complaint to be filed with the AHC for "[i]ncompetency, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the functions or duties of any profession licensed or regulated by this chapter." Subsection six provides that the Board may cause a complaint to be filed with the

AHC for "[v]iolation of, or assisting or enabling any person to violate, any provision of this chapter, or of any lawful rule or regulation adopted pursuant to this chapter."

The statute does not provide definitions for the terms in subsection 344.050.2(5). However, the issue of incompetence has been considered in other licensure contexts as the lack of ability or disposition to use a professional ability. *See Forbes v. Mo. Real Estate Comm'n*, 798 S.W.2d 227, 230 (Mo.App. W.D.1990) (finding sufficient evidence to show that a once-licensed real estate agent was not competent "to transact the business of a real estate salesperson in such a manner to safeguard the public interest"). The term "gross negligence" has been held to "connote[ ] an improper conduct greater either in kind or in degree or both than ordinary negligence. It is to be presumed that any licensed professional knows that he is to perform his professional duties with the degree of care required under the particular circumstances involved, i.e. free from negligence." *Duncan v. Mo. Bd. for Architects, Prof'l Eng'rs & Land Surveyors*, 744 S.W.2d 524, 532 (Mo.App. E.D.1988). Thus, the fact that the Division determined in one proceeding that Pulliam did not "recklessly, knowingly, or purposely abuse or neglect Morrison" does not resolve the separate issue of whether she performed her professional duties to the standard required by section 344.050. Additionally, the Division does not have the statutory authority to determine whether Pulliam's conduct warranted discipline against her license; only the Board has the authority to make that decision.

A closer look at the Board's amended petition further illustrates that the proceedings did not resolve the same issues, because one of the counts raised by the Board was not addressed at all in the EDL proceeding, although it was raised in the second investigation report issued by the Division. The Board alleged cause to discipline Pulliam's nursing home license based on three counts: (1) the care provided by her staff to Morrison; (2) her failure to request a criminal background check on an employee pursuant to section 660.317.3(1), failure to promptly contact the Department of Social Services to check the EDL on the employee pursuant to section 660.317.3(2), and her staff's failure to report incidents of the employee's abuse and neglect of residents pursuant to section 198.070.1; and (3) her assignment of charge nurse duties to a facility resident who was a licensed practical nurse but which facility records showed had suffered short-term memory loss in violation of section 198.088.6(j). The EDL decision addressed the issues raised in counts one and three of the Board's petition, but did not address the issues raised in count two. The issues in count two, however, were raised by the Division during its initial investigation, and cited in its second notice of noncompliance to the nursing home. Accordingly, the two notices of noncompliance issued by the Division formed the basis for all three of the subsequent proceedings against the nursing home and Pulliam. The Board's proceeding, however, addressed both violations cited by the Division in its two investigation reports. Conversely, the EDL proceeding only addressed the first violation. Additionally, while each proceeding was based on the same facts, each proceeding applied a different standard to those facts in order to resolve a separate issue.

## Conclusion

The circuit court erred in determining that the Board was not substantially justified in continuing to pursue its action against Pulliam's license after April 4, 2001. While the Division's original investi-

gation was the only factual basis for the Board's action, the EDL proceeding did not resolve all of the issues raised in that investigation. Additionally, the Board, and not the Division, is the entity charged with regulating the licenses of nursing home administrators and, therefore, the proceeding before the Division could not have resolved the issue of whether or not there was cause to discipline Pulliam's license. Point I is granted. Because of this disposition, we need not address Point II. The circuit court's award of fees is reversed.

ELLIS, C.J., and HARDWICK, J., concur.