**John IGOE, Appellant,**

v.

**DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS, Respondent.**

No. WD 66083.

Missouri Court of Appeals, Western District.

Oct. 24, 2006.

Application for Transfer to Supreme Court Denied Dec. 19, 2006.

Application for Transfer Denied Jan. 30, 2007.

William Earl Moench, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Virginia Murray and Diane Peters, Office of Attorney General, Jefferson City, for respondent.

PAUL M. SPINDEN, Judge.

After the Department of Labor and Industrial Relations twice rejected John Igoe's applications to be an administrative law judge or a legal advisor for the Division of Workers' Compensation, Igoe sued the department, alleging claims of age and sex discrimination and retaliation.[1] A jury returned a verdict for the department, and Igoe appeals. He asserts that he is entitled to a new trial or, in the alternative, a judgment notwithstanding the verdict. He argues that the circuit court erroneously allowed John Beakley, a member of the late Governor Mel Carnahan's staff, to testify about his and the Governor's involvement in deciding whom to hire as administrative law judges and legal advisors. Igoe also asserts that the circuit court erred in denying his motion for directed verdict and motion for new trial or in the alternative for judgment notwithstanding the verdict, because the department did not meet its burden of articulating a legitimate, non-discriminatory reason for its failure to hire him. We affirm the circuit court's judgment.

Igoe was 63 years old when he applied in 1997 for appointment to one of two administrative law judge positions and two legal advisor positions. The division awarded all four positions to women.

Three of the women were 42 years of age, and one was 32. Igoe complained of age and gender discrimination to the Missouri Human Rights Commission and the federal government's Equal Employment Opportunity Commission. During 1999, nine more administrative law judge and legal advisor positions became available, and Igoe applied for one of those positions. The division awarded these positions to seven women and two men who ranged in age from 34 to 55. Igoe complained again to the Human Rights Commission that he had been discriminated against on the basis of age, gender, and retaliation for filing his first complaint with the commission.

After receiving notices of his right to sue, Igoe sued the department in the circuit court of the 22nd Judicial Circuit in St. Louis, averring claims of age and sex discrimination and retaliation. The circuit court heard Igoe's claims with an advisory jury,[2] awarded Igoe damages, and ordered that the department instate Igoe as an administrative law judge. The department appealed, and the Supreme Court determined that venue was improper and ordered that the case be transferred to the circuit court in Cole County. *Igoe v. Department of Labor and Industrial Relations*, 152 S.W.3d 284 (Mo. banc 2005).

The circuit court in Cole County convened a jury trial on Igoe's claims. A jury found in favor of the department, and the circuit court entered judgment accordingly.[3] Igoe appeals.

---

1. Igoe named the department and the Division of Workers' Compensation as defendants, but, for convenience, we will refer only to the department as defendant.

2. This trial occurred before the Supreme Court handed down its decision in *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82 (Mo. banc 2003), which held that a plaintiff has a right to a jury trial in claims under Section 213.010 *et seq.*, RSMo 2000.

3. Because the department does not raise any issue concerning exemptions from the constrictions of Title VII and Missouri's human rights law for its administrative law judge positions, we do not concern ourselves with the matter, including whether or not the question has any merit.

■ Igoe asserts that he is entitled to a new trial because the circuit court erroneously allowed Beakley, Governor Carnahan's appointments secretary, to testify about his and the Governor's involvement in the decision making. He contends that, because the department did not disclose in discovery that Beakley and the Governor were decision makers for filling the positions and that Beakley took part in the interview process for the jobs, Beakley should not have been allowed to testify.[4] We disagree.

■ We review the circuit court's denial of a motion for a new trial, its decision to admit or to exclude evidence, and its administering of the rules of discovery for an abuse of discretion. *In the Interest of H.L.L.*, 179 S.W.3d 894, 896 (Mo. banc 2005); *Nelson v. Waxman*, 9 S.W.3d 601, 603 (Mo. banc 2000); *State ex rel. Crowden v. Dandurand*, 970 S.W.2d 340, 343 (Mo. banc 1998). A circuit court's "ruling [that] is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration" is an abuse of discretion. *Nelson*, 9 S.W.3d at 604. "[E]xamination of a witness whose name has not been disclosed, though requested, is a matter resting within the sound discretion of the [circuit] court." *Riley v. Union Pacific Railroad*, 904 S.W.2d 437, 446 (Mo.App.1995). In considering the circuit court's actions related to a response to pre-trial discovery, we consider whether the challenged act, under the totality of the circumstances, has resulted in prejudice or unfair surprise. *Siller v.* *Rivituso–Siller*, 129 S.W.3d 433, 436 (Mo. App.2004).

Three days before the trial began in this case, the department supplemented its answers to Igoe's first interrogatories. In response to Igoe's inquiry about the identities of individuals who provided information upon which the department relied in deciding not to hire Igoe, the department filed supplemental answers which indicated that Beakley "was involved in selecting ALJ's and LA's in 1997 and 1999 interviews." The department also responded to Igoe's inquiry about the identities of the persons who made the decision not to hire Igoe by stating that "[i]n both 1997, and 1999, the Governor's office provided the Department with the names of candidates for whom background checks should be conducted and to whom offers [sic] letters should be extended."

At trial, before Beakley testified, the department informed the circuit court that it would not ask Beakley who made the final decision on filling the administrative law judge or legal advisor positions and that it would not ask Beakley whether or not he made recommendations or gave input to the decision maker. The department said that it intended to ask Beakley "a couple" of "relevant" questions. Igoe testified in his case-in-chief that he did not know about Governor Carnahan's involvement in the hiring process and that he did not speak with anyone who worked in the Governor's office; however, Beakley testified that he interviewed Igoe about the positions and that another attorney had called the Governor's office to give a reference for Igoe. The department asked Beakley:

4. Igoe also complains about the department's closing argument in which the department allegedly relied on Beakley's testimony to argue that the reason for the hiring decisions was "politics." Igoe, however, did not object to this argument and did not preserve this issue for our review. *Collins v. Hertenstein*, 90 S.W.3d 87, 100 (Mo.App.2002). Moreover, we find nothing in the closing argument that connects Beakley's testimony to the department's argument that the reason for the hiring decisions was "politics."

Q. Are you aware that back in the 1997–1998 time frame, there were some Administrative Law Judge and legal advisor jobs being filled?

A. Yes, I am.

Q. And are you aware that there was a second round of jobs filled in 1999?

A. Yes, I am.

Q. Now, in your role in the Governor's office, did you ever receive phone calls from folks who were interested in those jobs?

A. Yes, I did.

Q. And did you ever receive communications from people who were not necessarily interested in the jobs, but they were talking to you on behalf of somebody else?

A. Yes, I did.

Q. Okay. Now, I will tell you that a man named John Igoe applied for both those rounds of jobs, okay?

A. Okay.

Q. Did you ever receive a phone call from anyone on behalf of John Igoe for those jobs?

A. Yes, I did.

Q. And who was that?

A. It was a lawyer from St. Louis named James or Jim Holleran.

Q. Okay. And was that on the first round of interviews or the second?

A. It was on the first round of interviews.

Q. Okay. I'm going to ask you another question. Did you ever speak with Mr. Igoe?

A. Yes, I did.

Q. And did you speak with him about the ALJ or Legal Advisor jobs?

A. Combined.

Q. Okay. Both jobs?

A. Yes.

Q. Okay. Did you speak with Mr. Igoe about the first round of interviews, the second round, or both?

A. The first round of interviews.

Q. Okay. Did you talk to him face-to-face?

A. I talked to him on the phone.

Q. Okay. Had you ever met Mr. Igoe before?

A. I've never met Mr. Igoe.

Q. Okay. Can you tell the jury just briefly about your conversation with Mr. Igoe?

A. Yes. I tried to emulate the interview process that Governor Carnahan— or participated with Governor Carnahan having our nominees go through the non-partisan court plan for judicial appointments.

The way the Governor structured those interviews was to ask us a very specific set of questions.

. . . .

Q. Anything stand out in your mind about your conversation with Mr. Igoe?

A. Yes. I asked Mr. Igoe if he would characterize for me why he thought he was qualified to be a Legal Advisor or an ALJ. The question made him quite angry. He became very frustrated with that, and explained to me that he had been appointed by Joe Teasdale to the Labor and Industrial Relations Committee, and wasn't that enough for the Governor and I.

It was a startling response to me, because at that point in the administration, I had conducted several thousand interviews. That's all I did. And this was the very first time I had—

. . . .

Mr. Igoe made it very clear to me that he was offended by my question.

On cross-examination, Igoe asked Beakley whom the final decision maker was.

Igoe complains that he was unfairly surprised because the department did not disclose that Beakley interviewed Igoe for the positions and that Beakley made recommendations to the Governor, who was the decision maker. Igoe knew, however, of Beakley's and the Governor's involvement in the decision. Although Igoe denied talking to anyone who worked in the Governor's office about the position, we view the evidence in the light most favorable to the circuit court's ruling and conclude that Igoe did know of the Governor's involvement after talking to Beakley about the positions. Moreover, in a deposition taken by Igoe, on September 27, 2001, Karla McLucas, the department's former director,[5] testified concerning the 1997 vacancies that she met with Beakley and other members of the Governor's staff. They told her, she said, that they would send her the resumes of the persons she should interview. She also said that, after she conducted the interviews, she met with Beakley and other members of the Governor's staff to discuss her assessments of the applicants and that, after this meeting, the Governor's staff was to inform her which applicants were to get background checks.

McLucas testified concerning the 1999 vacancies that Beakley and others on the Governor's staff told her to set up an interview panel and informed her that they already had names of individuals who were interested. McLucas also said that, after the panel conducted the interviews, she met with the Governor's staff, including Beakley, and discussed the panel's assessments of the applicants. After this meeting, the Governor's staff told her which applicants were to get background checks and to which applicants to send offer letters. The department also presented McLucas' deposition testimony at the first trial in March 2002.

Furthermore, Thomas Pfeiffer, the department's deputy director, testified at the first trial that he participated in interviewing applicants for the 1999 vacancies. He reported the same process that McLucas reported in her deposition.

The Supreme Court found that the Governor's office had authority to make administrative law judge and legal advisor appointments and that the Governor's staff told the department who was to be appointed. *Igoe*, 152 S.W.3d at 287. Thus, Igoe appears to be disingenuous in arguing that he was surprised by Beakley's testimony that the Governor was the ultimate decision maker.

■ Given this evidence, the circuit court had a sound basis for rejecting Igoe's contention that he was unfairly surprised by Beakley's testimony. "Where [a party] has prior knowledge of the state's possession of evidence, as did appellant in this case so as not to have been surprised by its introduction[,] there is no abuse of discretion." *State v. Sykes*, 628 S.W.2d 653, 657 (Mo.1982). Moreover, at the very minimum, Igoe knew of Beakley's identity three days before trial but did not interview or depose him before the department called him as a witness.

Further, the department fulfilled its promise not to ask Beakley who made the final decision or whether he made recommendations or gave input to the decision maker. Igoe, however, chose to ask Beakley those questions during cross-examination. During re-cross examination, Igoe asked Beakley whether or not the Governor ultimately made the decision, and Beakley said that he did. Igoe cannot introduce evidence and then claim on appeal that the circuit court committed re-

---

5. At trial, the department read portions of McLucas' deposition testimony into evidence.

versible error by admitting it. *Foster v. Village of Brownington,* 140 S.W.3d 603, 609 (Mo.App.2004). The circuit court did not abuse its discretion in denying Igoe's motion for new trial or, in the alternative, for judgment notwithstanding the verdict.

■ Igoe also asserts that the circuit court erred in denying this motion because the department did not meet its burden of articulating a legitimate, non-discriminatory reason for its failure to hire him. We disagree.

Again, we review the circuit court's denial of a motion for a new trial for abuse of discretion. *In the Interest of H.L.L.,* 179 S.W.3d at 896. The standard of review of a denial of a motion for judgment notwithstanding the verdict and directed verdict is essentially the same. *Giddens v. Kansas City Southern Railway Company,* 29 S.W.3d 813, 818 (Mo. banc 2000), *cert. denied,* 532 U.S. 990, 121 S.Ct. 1644, 149 L.Ed.2d 502 (2001). In reviewing the circuit court's judgment, we must determine whether or not the plaintiff made a submissible case. *Massman Construction Company v. Missouri Highways and Transportation Commission,* 31 S.W.3d 109, 112 (Mo.App.2000). "[T]his Court takes the evidence in the light most favorable to the verdict, giving the prevailing party all reasonable inferences from the verdict and disregarding the unfavorable evidence." *Nemani v. St. Louis University,* 33 S.W.3d 184, 185 (Mo. banc 2000), *cert. denied,* 532 U.S. 981, 121 S.Ct. 1623, 149 L.Ed.2d 485 (2001). "[We] will reverse the jury's verdict for insufficient evidence only where there is a 'complete absence of probative fact' to support the jury's conclusion." *Seitz v. Lemay Bank and Trust Company,* 959 S.W.2d 458, 461 (Mo. banc 1998) (citation omitted). We will not reverse the jury's verdict simply because reasonable minds can differ on the questions decided by the jury. *Massman,* 31 S.W.3d at 112.

In analyzing employment discrimination suits for failure to hire based upon circumstantial evidence, Missouri courts follow the three-step burden-shifting analysis set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *State ex rel. Swyers v. Romines,* 858 S.W.2d 862, 864 (Mo.App. 1993); *Conway v. Missouri Commission on Human Rights,* 7 S.W.3d 571, 574 (Mo. App.1999). The burden-shifting analysis is used for discrimination claims brought under the Missouri Human Rights Act, Section 213.010, RSMo 2000, *et seq.,* or for discrimination claims brought under Title VII of the Civil Rights Act of 1964. *Young v. American Airlines, Inc.,* 182 S.W.3d 647, 652 (Mo.App.2005), and *Midstate Oil Company, Inc. v. Missouri Commission on Human Rights,* 679 S.W.2d 842, 845–46 (Mo. banc 1984). The burden-shifting analysis also applies to retaliation claims. *Smith v. Riceland Foods, Inc.,* 151 F.3d 813, 818 (8th Cir.1998).

■ Under this burden-shifting analysis, the plaintiff has the initial burden of proving a *prima facie* case of discrimination or retaliation. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Smith,* 151 F.3d at 818. If the plaintiff meets this burden, the burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection or a legitimate, non-retaliatory reason for the action it took against the plaintiff. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Smith,* 151 F.3d at 818. If the employer articulates a nondiscriminatory or non-retaliatory reason, the burden shifts back to the plaintiff to prove that the reasons offered by the employer are a pretext and that the decision not to hire was based on the applicant's age or sex or in retaliation.

*McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817; *Smith*, 151 F.3d at 818; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The " 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff[,]' " however, " 'remains at all times with the plaintiff.' " *St. Mary's Honor Center*, 509 U.S. at 507, 113 S.Ct. 2742 (citation omitted).

No one disputes that Igoe made a *prima facie* case of discrimination and retaliation under the three-step *McDonnell Douglas* analysis. Igoe asserts, however, that the department did not articulate a legitimate, non-discriminatory and non-retaliatory reason for its failure to hire him. He asserts that the department did not meet its burden of production because it did not identify the ultimate decision maker, much less explain the reasons for not hiring him. We disagree.

But for Beakley's testimony, we would agree with Igoe that the department did not meet its burden of articulating a non-discriminatory and non-retaliatory reason for not hiring him. Although the department offered McLucas' and Pfeiffer's testimony and testimony from two other panel members involved in the 1999 interviews of the applicants, these individuals did not decide whom to hire, and they did not know the criteria used for making the decision. Thus, any non-discriminatory and non-retaliatory reasons they offered to explain why Igoe might not have been hired were not relevant unless the ultimate decision maker relied on these reasons in making the decision not to hire Igoe.

McLucas' and Pfeiffer's testimony established that the Governor's office decided

who was to receive offers. Hence, as the Supreme Court concluded:

> These judge and legal advisor positions ... represent the governor's administration in dealing with the resolution of workers' compensation claims.... As an elected official, the governor—not the department director—is held politically responsible for those who are chosen for these executive-branch administrative law judge positions. Further, an administrative law judge may be discharged or removed only by the governor. Section 287.610.1.
>
> The director of the Department of Labor and Industrial Relations reviewed applications for these positions and interviewed candidates. The governor's staff reviewed the applications and told the department director the names of the persons who were to be appointed. Under the constitutional and statutory scheme, the governor can tell the department director which candidates he wants selected. The governor appoints the director of the department. The director serves at the governor's pleasure. Mo. Const. art. IV, sec. 17. Though a statute may assign the appointment authority to a department or division, the director serves at the pleasure of the governor and can be removed if he or she fails or refuses to carry out the governor's wishes. Mo. Const. art. IV, sec. 17.

*Igoe*, 152 S.W.3d at 286–87 (footnotes omitted).[6] Thus, to rebut Igoe's *prima facie* case of discrimination and retaliation, the department was obligated to produce some legitimate, nondiscriminatory and non-retaliatory reason for the Governor's rejection of Igoe's application. Beakley

---

**6.** Igoe correctly asserts that this passage in the Supreme Court's decision was *dicta* and had nothing to do with the court's reversal on venue grounds. The court's conclusion, however, is supported by the evidence in this case.

provided the only evidence explaining the Governor's reason.

In response to Igoe's questioning, Beakley testified that he participated in the decision. Igoe asked Beakley:

Q. Mr. Beakley, you didn't make the decision on these appointments, did you?

A. I participated in the process.

Q. Did you make the decision?

A. Yes, I did.

Q. You made the decision to hire these people?

A. Ultimately my responsibility was to make recommendations to the Governor about appointments.

. . . .

Q. In your decision-making, did you make this decision alone?

A. No.

Q. Who did you make the decision with?

A. With Director McLucas and the Governor's chief legal counsel, Joe Bednar.

Q. And did you make the decisions in both rounds of hiring.

A. Yes, we did.

. . . .

Q. And did you make the ultimate decision who to hire?

A. It was ultimately my responsibility to make recommendations to the Governor on who was appointed.

Q. So ultimately it was the Governor who made the decisions?

A. In the end, I framed these decisions for the Governor and I put them in front of him. So you could say yes.

Q. Now, the decisions that were made by the Governor, did he decide to choose all of the people that you recommended to him?

A. Yes, he did.

. . . .

Q. Did the Governor have any conversations with you about who to hire for any of those posts?

A. After we had worked up recommendations for the Governor, I sat down with him and laid out what our recommendations were. And he agreed with those.

Q. All right. So fair to say then that he was the ultimate decision-maker on who got those jobs?

A. Yes, he is.

Beakley identified the Governor as the ultimate decision maker.

Beakley said that he remembered a telephone interview that he had with Igoe because it was "startling" because of the "unusual nature" of Igoe's responses to his questions. When, Beakley said, he asked Igoe to explain why Igoe believed that he was qualified to be an administrative law judge or legal advisor, Igoe became "quite angry" and "very frustrated." Igoe made it clear, Beakley thought, that he was "offended by [the] question." Igoe responded to Beakley's question by noting that Governor Joe Teasdale had appointed him to the Labor and Industrial Relations Commission and that this alone should be enough explanation for the Governor and Beakley. Given the nature of the positions and the importance of good judicial temperament, this evidence was sufficient to meet the department's burden of producing a legitimate, nondiscriminatory and non-retaliatory reason for the Governor's decision not to hire Igoe.

Thus, because the department met its burden of production, the burden shifted back to Igoe to prove, by a preponderance of the evidence, that the proffered reasons were not a pretext and that the decision not to hire him was actually motivated by his age or sex or in retaliation for his complaints. Igoe did not meet this bur-

den; therefore, the circuit court did not err in denying Igoe's motion for directed verdict and motion for new trial, or in the alternative for judgment notwithstanding the verdict.

We affirm the circuit court's judgment.

HAROLD L. LOWENSTEIN, Presiding Judge, and THOMAS H. NEWTON, Judge, concur.