**T. Lee NIGRO, M.D., Appellant,**

v.

**ST. JOSEPH MEDICAL CENTER and Sheryl Davis, Respondents.**

**No. WD 73810.**

Missouri Court of Appeals, Western District.

May 1, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 29, 2012.

Application for Transfer Denied Aug. 14, 2012.

Patrick R. Miller, Overland Park, KS, for Appellant.

Ted R. Osburn, Mark R. Dunn, and Michael E. Gardner, Cape Girardeau, MO, for Respondents.

Before Division One: CYNTHIA L. MARTIN, Presiding Judge, and THOMAS H. NEWTON and KAREN KING MITCHELL, Judges.

KAREN KING MITCHELL, Judge.

This is a breach of contract, defamation, and tortious interference case. The primary issues are whether the defendants published true statements about the plaintiff and whether the plaintiff released the defendants from liability for the publication of confidential information. We hold that, as a matter of law, the statements were either true or substantially true and that, under the circumstances of this case, the plaintiff released the defendants from liability for the publication of accurate information to the entity that requested it. Accordingly, we affirm the circuit court's grant of summary judgment in the defendants' favor.

## Facts and Procedural Background[1]

Appellant Dr. T. Lee Nigro is a surgeon who was a member of the medical staff of Respondent St. Joseph Medical Center ("St. Joseph"). Nigro allegedly failed to respond to a call to treat a patient ("the patient") who ultimately died.

St. Joseph's quality assurance committee reviewed the incident. Nigro appeared before the quality assurance committee and stated that he had received only one call from the emergency department, that he had been told only that the patient had a thigh infection, and that he had never been informed that the patient had necrotizing fasciitis.[2] Dr. Sean Fulton stated

---

1. On appeal from the grant of a motion for summary judgment, we review the facts in the light most favorable to the non-movant. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

2. Necrotizing fasciitis is a rare but very severe type of bacterial infection. It can destroy the muscles, skin, and underlying tissue. *Necrotizing Soft Tissue Infection*, MEDLINEPLUS, (2011) http://www.nlm.nih.gov/medlineplus/ ency/article/001443.htm. "To necrotize" means to cause necrosis, which means the death of living tissue. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1511 (1981). The parties do not explain the significance of the distinction between a thigh infection and necrotizing fasciitis, but we will presume that necrotizing fasciitis caused or may have caused the patient's death and that, if the patient had had a thigh infection only, Nigro would not have been suspended.

that the emergency department had records that indicated that, on the night in question, Nigro received four calls. The quality assurance committee then "moved and approved that the committee supports" a five-day summary suspension of Nigro. Upon the committee's recommendation, Dr. Steve Sanders, the chief medical officer of St. Joseph, in fact suspended Nigro for five days.

The quality assurance committee also recommended that the medical executive committee[3] meet during the period of suspension in order to review the matter more thoroughly and make a final recommendation. The medical executive committee then met and heard from Nigro and Sanders regarding the incident. The medical executive committee found that it needed more information in order to make a final determination. Accordingly, it extended Nigro's summary suspension to fourteen days and reconvened four days later.

At the second executive committee meeting, Fulton appeared and gave his version of the incident. Fulton stated that he had informed Nigro that the patient had necrotizing fasciitis, that the patient needed to be seen, and that he had contacted Nigro four times regarding the patient. In addition, Sanders provided the executive committee members with a summary of telephone conversations that he had conducted with other individuals who had knowledge of the incident. The executive committee recommended that Nigro be removed from the staff. Specifically, the minutes of the executive committee's meeting state:

*A motion was made and seconded to recommend that Dr. Nigro be immediately removed from the medical staff based upon the following: failure to respond to call when requested for [the patient]; several past instances of failing to respond to call; lack of truthfulness to the Quality Assurance Committee and Medical Executive Committee in investigating this complaint; and a pattern of quality concerns raised in the past. The motion carried with 10 in favor and 2 voting against the motion.*

(Italics in original.)

Nigro requested and received a hearing and appeal of his suspension. During the course of the hearing, the parties entered into a memorandum of understanding that settled the dispute. In the memorandum of understanding, Nigro "abandon[ed] his appeal of the summary suspension and waive[d] all rights ... to ... the hearing, which was underway."

St. Joseph agreed that it would maintain peer review materials confidential and that it would release them as required by law. It also agreed to recommend to the executive committee "that the summary suspension be lifted." St. Joseph also agreed that, if the executive committee lifted the summary suspension, it would report to the National Practitioner Data Bank as follows: "The Medical Executive Committee terminated the summary suspension. Dr. T. Lee Nigro's medical staff privileges lapsed."

Two years later, St. Joseph received a letter ("the request" or "Blue Cross's request") from Blue Cross Blue Shield of Kansas City ("Blue Cross"), stating that Nigro had sought network participation with Blue Cross. In the request, Blue Cross asked whether Nigro's staff privileges had been "restricted, denied, revoked, suspended, not renewed, been put

---

3. We will refer to the quality assurance committee and the medical executive committee collectively as "the committees."

on probation, been subjected to disciplinary action, or put on a corrective action program." The request also asked if Nigro had "ever been subject to disciplinary action(s) by a Quality Assurance Committee, Credentials Committee, Peer Review Committee, or any other such committees," and requested "details for all 'YES' answers on a separate page."

The request was accompanied by a document entitled "Blue Cross and Blue Shield of Kansas City Attestation, Authorization and Release," ("the authorization and release") which was signed by Nigro. In the authorization and release, Nigro gave his consent for Blue Cross to "solicit information" concerning his "professional qualifications, credentials, clinical competence, character, ethics, behavior, or any other matter related to [his] application" from "health care facilities" or their employees. The authorization and release then stated: "**I further consent and authorize** these entities and persons, and their employees ... to supply written information, records, or documents in response to any inquiries received from Blue Cross." (Emphasis in original.) The release stated further that "**I consent to and authorize and release** ... [persons responding to inquiries from Blue Cross] ... from liability for the release of information ... provided that such release of information is done in good faith and without malice based on a reasonable belief that the information is true." (Emphasis in original.)

Upon St. Joseph receiving the request and the authorization and release from Blue Cross, Respondent Sheryl Davis, Director of Medical Staff Services, responded by letter ("the letter"). The letter stated:

After a meeting of the Quality Assurance Committee on December 7, 2005, Dr. Nigro was summarily suspended for a failure to respond to call and a question of his truthfulness during their investigation. On December 9, the Medical Executive Committee met and upheld the summary suspension pending a thorough investigation of these matters.

On December 13, 2005, the Medical Executive Committee met and recommended revocation of Dr. Nigro's Medical Staff Membership and Clinical Privileges. This was based on a failure to respond to call, previous instances of failing to respond to call, lack of truthfulness to the QA Committee and Medical Executive Committee, and a pattern of quality concerns raised in the past. The summary suspension remained in effect and Dr. Nigro requested a hearing. On the second day of the hearing, Dr. Nigro requested adjournment of the hearing. On May 2, 2006, the Executive Committee lifted the summary suspension and Dr. Nigro withdrew his application for reappointment.

On December 9, 2009, Nigro sued St. Joseph and Davis for breach of contract, defamation, and tortious interference. The petition alleged that the statements contained in the letter were false in the following respects: (1) Nigro did not fail to respond to a call on the subject night; (2) Nigro was truthful with all investigators during review of the matter; (3) there were no "previous valid instances of failing to respond to call"; (4) Nigro was truthful to the quality assurance committee and the executive committee; (5) there was no "pattern of quality concerns" in that, although St. Joseph investigated thirteen allegations of surgical complications, "no quality concerns were raised on any of these thirteen cases." The petition alleged further that Nigro was damaged in that he has been unable to obtain credentialing with Blue Cross and that he has been unable to obtain staff privileges at Menorah Medical Center.

On October 13, 2010, St. Joseph and Davis filed a motion for summary judgment. In it, they argued that judgment as a matter of law was appropriate because, among other things, (1) they[4] did not breach any contract because the authorization and release permitted them to send the letter; (2) the defamation claim failed because (a) the statements in the letter were true, (b) Nigro consented to their publication to Blue Cross, and (c) they were subject to a qualified privilege; and (3) the tortious interference claim failed because they were justified in sending the letter.

█ On November 19, 2010, Nigro filed a motion seeking additional time to conduct discovery and seeking "enforcement of discovery" ("the discovery motion").[5] The discovery motion alleged that the defendants had not properly responded to written discovery and that they had refused to "present themselves" for depositions. The motion stated that

It was Plaintiff's expectation that much of the discovery issues in dispute regarding the written discovery would be resolved through depositions. Plaintiff began requesting dates of availability for depositions of Defendants as early as May 21, 2010.... Rather than agree to produce themselves for deposition, Defendants proceeded with the filing of the Motion for Summary Judgment and now refuse to present themselves for deposition.

After a hearing, the circuit court denied the discovery motion.

Nigro then responded to the motion for summary judgment, and the circuit court granted the motion. This appeal follows.

## Standard of Review

Nigro appeals both the circuit court's denial of the discovery motion and the court's grant of the motion for summary judgment. Our review of the denial of the discovery motion is governed by an abuse of discretion standard. *Chouteau Auto Mart, Inc. v. First Bank*, 91 S.W.3d 655, 660 (Mo.App. W.D.2002). A circuit court abuses its discretion when its ruling shocks the sense of justice, shows a lack of consideration, and is obviously against the logic of the circumstances. *River City Dev. Assocs., LLC v. Accurate Disbursing Co., LLC*, 345 S.W.3d 867, 871 (Mo.App. E.D.2011). "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *Wilkerson v. Prelutsky*, 943 S.W.2d 643, 648 (Mo. banc 1997). The appellant bears the burden of establishing that the circuit court abused its discretion. *W. Cent. Concrete, LLC v. Reeves*, 310 S.W.3d 778, 782 (Mo.App. W.D.2010) (quoting *State ex rel. Webster v. Lehndorff Geneva, Inc.*, 744 S.W.2d 801, 804 (Mo. banc 1988)).

Our review of the circuit court's grant of the motion for summary judgment is essentially de novo, and we will use the same criteria that applied to the circuit court's review of the motion. *ITT Commercial,*

4. It does not appear to us that Davis was a party to any contract with Nigro. Nevertheless, the point is immaterial because Davis did not raise the lack of a contractual relationship in the motion for summary judgment, and, as explained below, Nigro's breach of contract claim fails for the reason that Davis *did* raise in the motion. We include this note only to clarify that nothing in this opinion is meant to imply that Davis was a party to the memorandum of understanding.

5. In determining whether the circuit court abused its discretion in administering discovery, we review the facts in the light most favorable to the court's judgment. *Igoe v. Dep't of Labor & Indus. Relations*, 210 S.W.3d 264, 268–69 (Mo.App. W.D.2006).

854 S.W.2d at 376. "The purpose of summary judgment under Missouri's fact-pleading regime is to identify cases (1) in which there is no genuine dispute as to the facts and (2) the facts as admitted show a legal right to judgment for the movant." *Id.* at 380. When the moving party is the defendant, summary judgment is proper when the movant shows:

(1) facts that negate *any one* of the claimant's elements facts; (2) that the claimant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements; or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support the defendant's properly-pleaded affirmative defense.

*Id.* at 381 (emphasis in original).

### Analysis

### I. The discovery motion

▇ Nigro first argues that the circuit court abused its discretion in denying his motion seeking additional time to conduct discovery and seeking "enforcement of discovery" in that further discovery would have revealed that the executive committee's stated basis for recommending that he be removed from the staff was false. We disagree.

The issue here is not whether Nigro was *entitled* to discovery regarding the veracity of the committees' findings. Rather, the issue is whether the circuit court abused its discretion in denying a continuance after the motion for summary judgment had been filed and after eleven months had elapsed since Nigro had filed his petition.

▇ As noted above, whether to allow (or compel) further discovery once a summary judgment motion has been filed is in the discretion of the circuit court. *State ex rel. Thomas v. Olvera,* 987 S.W.2d 373, 376 (Mo.App. W.D.1999).

The justness of discretion exercised against a request for more discovery before adjudication of a pending motion for summary judgment depends upon the history of the case, the conduct of the parties and the good faith nature of the request, and, above all else, the purposes that discovery is meant to accomplish.

*Curnutt v. Scott Melvin Transp.,* 903 S.W.2d 184, 193 (Mo.App. W.D.1995). A party moving for such a continuance may not rest on the bare assertion that further discovery *might* produce a dispute of material fact; rather, the party must set out the evidence that he seeks to obtain and must show how that evidence would create a genuine issue of material fact. *Chouteau,* 91 S.W.3d at 660; *Olvera,* 987 S.W.2d at 376.

Here, the court did not abuse its discretion for two reasons: (a) Nigro had the means and the time to conduct the discovery he sought without court intervention, yet he did not use them; and (b) the evidence he sought to establish was either immaterial or insufficiently definite to warrant relief under Rule 74.04(f).

### a. The circuit court did not abuse its discretion due to the history of this case and Nigro's conduct.

▇ Under Rule 74.04(f), a circuit court does not abuse its discretion in refusing to grant a continuance to allow for additional discovery when the party seeking the discovery had adequate means and ample time to conduct it without court intervention. *See Curnutt,* 903 S.W.2d at 193 (affirming the circuit court's denial of a Rule 74.04(f) motion in part because the parties were less than diligent in initiating discov-

ery, because they had failed to file a motion to compel, and because they had not attempted to depose witnesses); *Resolution Trust Corp. v. Lieberman,* 826 S.W.2d 55, 56 (Mo.App. E.D.1992) (holding that, since the party seeking the continuance had ample time to conduct discovery, the circuit court did not abuse its discretion in refusing to grant the continuance).

Here, Nigro did not avail himself of the time and resources he had to obtain discovery. He filed the discovery motion eleven months after he filed the petition. In the discovery motion, Nigro primarily argued that he needed more time to prove that the committees' findings were false. The parties had an ongoing dispute regarding Nigro's entitlement to the sought-after discovery, but Nigro had never filed any motion to compel discovery prior to the November 19, 2010, discovery motion (filed approximately one month after the defendants' motion for summary judgment). Nigro stated in the discovery motion that he believed the parties' dispute regarding the written discovery would have been resolved by depositions and that the discovery motion was meant to compel the defendants to "present themselves" for depositions.

But Nigro's argument ignored the fact that court intervention is not necessary to compel parties to make themselves available for depositions. Rule 57.03(a) provides:

> Leave of court [to conduct a deposition] ... must be obtained *only if* the plaintiff seeks to take a deposition prior to the expiration of 30 days after service of the summons and petition upon any defendant.... The attendance of witnesses may be compelled by subpoena.... *The attendance of a party is compelled by notice as provided in ... this Rule.*

(Emphasis added.) Thus, it was within Nigro's own power to compel depositions once thirty days had expired from the date of service upon any defendant,[6] yet, eleven months after he filed the petition, he asked the court to exercise its discretion to give him more time and to compel the defendants to make themselves available for depositions. We do not find that the court abused its discretion in refusing to allow more time for depositions when Nigro himself could have compelled depositions under Rule 57.03 and had ample time to do so.[7]

**b. The circuit court did not abuse its discretion because the sought-after discovery was either immaterial or insufficiently definite.**

In order to warrant relief under Rule 74.04(f), the movant must (1) set out the evidence that the sought-after discovery would adduce; and (2) show that that evidence would create a genuine issue of material fact. *Chouteau,* 91 S.W.3d at 660. As noted, it is insufficient to allege that the sought-after discovery *might* produce evidence establishing a genuine issue of mate-

6. Case.net indicates that St. Joseph was served on January 19, 2010, ten months before Nigro filed the discovery motion.

7. Of course, it is the more courteous (and thus better) practice for parties to agree to deposition dates as opposed to exercising Rule 57.03's power to compel attendance. Nevertheless, Rule 57.03 provided Nigro a remedy for the defendants' refusal to make themselves available, and it is unreasonable to fault the circuit court for refusing to exercise *its* discretion when Nigro failed to exercise *his* discretion in availing himself of that remedy. If Nigro had issued notices under Rule 57.03, it would have been for the defendants to seek court intervention via a motion to quash if (as they claimed) the sought-after depositions could have revealed only immaterial information.

rial fact.[8] *Id.*

Here, most of the information that Nigro claims would create a genuine issue of material fact is immaterial. Nigro alleges that further discovery would have revealed that what the committees found to be true was not true: essentially that he was guilty of no wrongdoing, and that, to the extent the committees stated otherwise, the statements were false. But as explained further below, the letter was accurate in stating *what* the committees found, and the accuracy of their findings is immaterial to whether Davis accurately reported them. *See Rice v. Hodapp*, 919 S.W.2d 240, 243–44 (Mo. banc 1996) (holding that a supervisor's statement that an employee was *found* guilty of sexual harassment was true, irrespective of whether the sexual harassment had in fact occurred, because management had conducted an investigation and had concluded that the latter had committed sexual harassment).

Nigro does claim that he "is confident" that further discovery would reveal that Davis issued the letter in bad faith, which would be material to Nigro's breach of contract claim in that Nigro arguably released St. Joseph and Davis from liability only for disclosures made in good faith. However, Nigro's alleging that he "is confident" that further discovery would reveal Davis's bad faith is tantamount to alleging that further discovery *might* reveal a dispute of material fact, which, as noted, is insufficient to warrant relief under Rule 74.04(f). Nigro did not set out what evidence, if obtained or established, would show that St. Joseph and Davis sent the letter in bad faith.[9] Point denied.

## II. Section 537.035

Nigro next argues that the circuit court erred in granting summary judgment in that St. Joseph and Davis violated section 537.035 [10] when they sent the letter. We disagree. Nigro never alleged a cause of action under 537.035, and, therefore, the circuit court did not grant summary judgment for any such hypothetical cause of action.[11] The appellant cannot raise claims for the first time on appeal. *Kratky v. Musil*, 969 S.W.2d 371, 378 (Mo.App. W.D. 1998). Point denied.

## III. False statements and release of information in bad faith

Nigro next argues that the circuit court erred in granting summary judgment in

**8.** A party's entitlement to relief under Rule 74.04(f) is narrower than its entitlement to discovery generally, which applies to any information "reasonably calculated to lead to the discovery of admissible evidence." Rule 56.01(b). This is not a case where the party moving for summary judgment prematurely filed the motion in an attempt to replace the broad standard of Rule 56.01(b) with the narrower one of Rule 74.04(f). If the circuit court, in its discretion, found that a party had attempted to circumvent the broader standard by hastily filing a motion for summary judgment, it could properly grant a continuance even if the party seeking the continuance could not specifically identify the information that would create a genuine dispute of material fact.

**9.** We note that it is difficult to imagine how Nigro would establish bad faith, given that Davis accurately reported the findings of the medical executive committee, which was the information that Blue Cross was seeking. Again, that the committees' underlying conclusions may have been inaccurate is immaterial to whether Davis faithfully and accurately reported those conclusions to Blue Cross. But regardless of whether it was possible for Nigro to set out the evidence to be obtained that would prove bad faith, Nigro did not do so in his Rule 74.04(f) motion.

**10.** Statutory citations are to RSMo 2000, as updated through the 2011 cumulative supplement.

**11.** We express no opinion as to whether a private cause of action exists for violations of section 537.035(4).

that there were disputed issues of material fact as to whether the letter contained false information and/or information that was provided in bad faith. We disagree. St. Joseph and Davis argue that Nigro has abandoned this argument in that he failed to cite any relevant authority (apart from authority for the standard of review) to support his point on appeal. *See Carlisle v. Rainbow Connection, Inc.*, 300 S.W.3d 583, 585 (Mo.App. E.D.2009) ("If a party does not support contentions with relevant authority or argument beyond conclusory statements, the point is deemed abandoned."). We agree that Nigro's point could be denied on that basis alone, but we exercise our discretion to address the merits. *See Lunceford v. Houghtlin*, 326 S.W.3d 53, 62 (Mo.App. W.D.2010). In doing so, we will assume that this point relates to Nigro's defamation claims.

■ "The elements of defamation in Missouri are: 1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 70 (Mo. banc 2000).

### a. Truth as a defense to defamation

■ In any defamation case, the truth of the allegedly defamatory statement may be submitted as evidence, Mo. CONST. art. I, § 8, and our supreme court has interpreted that to mean that the truth is an *absolute* defense to a defamation claim. *Rice*, 919 S.W.2d at 243. Thus, for the purposes of defamation, it does not matter whether a statement was made in bad faith, so long as it was true.[12] *See id.*;

RESTATEMENT (SECOND) OF TORTS § 581A cmt. a (1977) ("There can be no recovery in defamation for a statement of fact that is true, although the statement is made for no good purpose and is inspired by ill will toward the person about whom it is published and is made solely for the purpose of harming him."). The test to be administered in evaluating the defense of truth is whether the challenged statement is substantially true. *Turnbull v. Herald Co.*, 459 S.W.2d 516, 519 (Mo.App.1970). It is not necessary that the precise facts disclosed be literally true. *Id.* Slight inaccuracies are immaterial if the allegedly defamatory charge is true in substance. *Id.*; *see also Cockram v. Genesco, Inc.*, 2010 U.S. Dist. LEXIS 142521, *8 (W.D.Mo. Dec. 9, 2010) (applying Missouri's "substantial truth" standard to an employer's written statements about a former employee). "A person is not bound to exact accuracy in his statements about another, if the statements are essentially true." *Thurston v. Ballinger*, 884 S.W.2d 22, 26–27 (Mo.App. W.D.1994) (applying the "substantial truth" standard, but finding that the defendant's oral statements were not substantially true). A substantially true statement contains the same "sting" as the truth, which means that the plaintiff's damage would have been the same irrespective of whether the defendant stated the truth or the substantial truth. *Turnbull*, 459 S.W.2d at 519.

In arguing that the letter was defamatory, Nigro asserts, not that Davis inaccurately reported the committees' findings, but that the findings themselves are inaccurate. The issue of whether, for the pur-

---

12. Of course, people can *agree* to keep the truth confidential, and they can *agree* to release true information only in good faith. But any such agreement is irrelevant to analyzing whether the absolute defense of truth applies to a defamation claim. Therefore, to the ex-

tent Nigro is claiming that St. Joseph and Davis released true information in bad faith or in violation of the parties' agreement, we address that argument in conjunction with his breach of contract claim.

poses of defamation, a speaker who publishes *the results* of an investigation is responsible for *the accuracy* of the investigation was addressed in *Rice*. In *Rice*, an employee's supervisor stated that there had been an investigation regarding whether the plaintiff had committed sexual harassment; that, as a result of the investigation, the plaintiff was being transferred; and that the investigation revealed that sexual harassment had in fact occurred. 919 S.W.2d at 244. The plaintiff argued that the statements were defamatory in that he had not committed sexual harassment. *Id.* The supreme court held that the truth of the statement—that the investigation occurred, that the plaintiff was transferred, and that management had concluded that the plaintiff had committed sexual harassment—entitled the supervisor and the employer to summary judgment, notwithstanding that the plaintiff contested the accuracy of management's conclusions. *Id.* at 244–45; *see also Turnbull*, 459 S.W.2d at 519 (noting that, while it was untrue that the plaintiff had *committed* burglary, it was true that he had been *arrested on suspicion* of burglary, which is what the defendant had written). Therefore, with respect to Davis's report-

ing what the committees found or did, her statements will be deemed true even if the committees erroneously made their findings or acted without just cause.

**b. Applicability of the truth defense**

▇▇▇ Here, the statements in the letter [13] are either true or substantially true. We will analyze the statements in the letter sentence by sentence.

"After a meeting of the Quality Assurance Committee on December 7, 2005, Dr. Nigro was summarily suspended for a failure to respond to call and a question of his truthfulness during their investigation." That is true: Nigro was called before the quality assurance committee to discuss his alleged [14] failure to respond to a call; after he left, the committee noted that the emergency department had a record of four calls to Nigro, whereas he had told the committee that he had received only one (thus calling into question his truthfulness); and Nigro was suspended after the meeting. Nigro does not dispute that he was called before the committee or that the committee made findings against him or that the committee suspended him. [15] Rather, he disputes the accuracy of the

---

13. Nigro also claims that St. Joseph and Davis made defamatory statements to Menorah Medical Center. We need not address these statements because: (1) Nigro did not mention them in his petition; and (2) he concedes that they communicated essentially the same information contained in the letter to Blue Cross.

14. To the extent Nigro rests his claim on Davis's failure to use the word "alleged," the argument fails because, from the context of the letter, it was clear that Nigro contested the charge that he failed to respond to call. The failure to use the word "alleged" in the context of relating an incident, the facts surrounding which the parties clearly disputed, contains no greater "sting" than using the word would have created. *See Turnbull*, 459 S.W.2d at 519.

15. Nigro argues that, pursuant to St. Joseph's bylaws, the committee's findings never became final and that the memorandum of understanding vacated the preliminary findings. The argument is irrelevant because Blue Cross did not ask whether any findings had become final: it asked whether Nigro had ever been suspended or subjected to disciplinary proceedings and requested details for any "yes" answers. But even if the argument were relevant, it is meritless. Nowhere in the memorandum of understanding did the parties agree that the committee's previous findings were to be vacated. Rather, the memorandum states that Nigro waived his rights to the hearing, which existed to provide Nigro an opportunity to challenge the medical executive committee's findings.

committee's findings. Again, the accuracy of the committee's underlying findings does not alter the truth of Davis's statements: she accurately reported that the committee met to discuss Nigro's alleged failure to respond to call and that it suspended Nigro after it called into question his truthfulness regarding the incident. *Cf. Rice,* 919 S.W.2d at 244–45.

"On December 9, the Medical Executive Committee met and upheld the summary suspension pending a thorough investigation of these matters." That is true: the medical executive committee met, upheld the suspension, and decided it needed further information before making a final determination. Nigro claims that no "thorough investigation" occurred, but his argument is meritless. An investigation—wherein the committee questioned Nigro, Fulton, and heard the results of Sanders's telephone conversations with other witnesses—unquestionably occurred. Whether the investigation was "thorough" is a matter of opinion, which cannot form the basis of a viable defamation claim. *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.,* 354 S.W.3d 234, 244 (Mo.App. E.D.2011) ("[S]tatements of opinion are protected by an absolute privilege even if the statements are 'made maliciously or insincerely.'") (quoting *Pape v. Reither,* 918 S.W.2d 376, 380 (Mo.App. E.D.1996)).

"On December 13, 2005, the Medical Executive Committee met and recommended revocation of Dr. Nigro's Medical Staff Membership and Clinical Privileges." That is indisputably true.

"This was based on a failure to respond to call, previous instances of failing to respond to call, lack of truthfulness to the QA Committee and Medical Executive Committee, and a pattern of quality concerns raised in the past." Nigro concedes that this statement is virtually a verbatim repetition of the medical executive committee's minutes. Again, the alleged inaccuracy and injustice of the committee's findings and actions does not alter the fact that Davis accurately reported what the committee found and did. *Cf. Rice,* 919 S.W.2d at 244–45.

"The summary suspension remained in effect and Dr. Nigro requested a hearing." The statement is indisputably true.

"On the second day of the hearing, Dr. Nigro requested adjournment of the hearing." Nigro argues that this statement is false in that the parties *mutually agreed* to terminate the proceeding. However, Nigro has not explained how the truth is materially different or less damaging than what Davis wrote, particularly given the next sentence, which clarifies that the committee lifted the suspension in response to the hearing being terminated. Whether Nigro himself requested that the hearing be terminated and the suspension lifted, or whether the parties mutually agreed to that outcome, is immaterial in that both notions carry the same "sting": Nigro was successful in getting the suspension lifted, though he did not carry the hearing on the committee's findings to its fruition. The difference between Davis's statement and the "truth," to the extent that there is a difference, is therefore insufficient to support a defamation claim. *See Turnbull,* 459 S.W.2d at 519.

"On May 2, 2006, the Executive Committee lifted the summary suspension and Dr. Nigro withdrew his application for reappointment." The statement is indisputably true.

Accordingly, we hold that the statements in the letter were either true or substantially true and that the circuit court therefore did not err in granting summary

judgment on Nigro's defamation claims. Point denied.[16]

**IV. Nigro released St. Joseph and Davis from liability for publishing information that, pursuant to the memorandum of understanding, would have been confidential but for the authorization and release.**

■ Nigro argues that the circuit court erred in granting summary judgment in that there were disputed issues of material fact regarding whether St. Joseph and Davis breached the memorandum of understanding. We disagree.

■ In their motion for summary judgment, St. Joseph and Davis argued that judgment as a matter of law was appropriate in that they had established the defense of release. Release is an affirmative defense, and, initially, the defendant bears the burden to prove it. *Rice v. Bol,* 116 S.W.3d 599, 605 (Mo.App. W.D.2003). In order to prove the defense of release, defendants must show that the plaintiff intended to release them from liability for the subject conduct and that the plaintiff used clear, precise, and unequivocal language in so doing. *Ensminger v. Burton,* 805 S.W.2d 207, 217 (Mo.App. W.D.1991).

Here, the memorandum of understanding obligated St. Joseph to "maintain the peer review materials [17] concerning [Nigro] confidential." Nevertheless, by signing the authorization and release, Nigro clearly, precisely, and unequivocally manifested his intention to release St. Joseph and Davis from any liability associated with responding to Blue Cross's request,[18] so long as any such response was made "in good faith and without malice based on a reasonable belief that the information is true." [19] Thus, in order to establish their affirmative defense as a matter of law, St. Joseph and Davis were required to show that the letter was (1) responsive to Blue Cross's request for information; and (2) written in "good faith and without malice based on a reasonable belief that the information is true."

The letter was indisputably responsive to Blue Cross's request. Blue Cross asked whether Nigro's staff privileges had been "restricted ... suspended, not renewed, ... [or] been subjected to disciplinary action." Blue Cross also asked if Nigro had "ever been subject to disciplinary action(s) by a Quality Assurance Committee, Credentials Committee, Peer Review Commit-

**16.** Since we decide that the statements were protected by an *absolute* privilege, we need not decide whether they were protected by the *qualified* privilege associated with responding to a request for information and providing such information to protect the requester's interests. *See Henry v. Halliburton,* 690 S.W.2d 775, 781 (Mo. banc 1985) ("Providing information at the request of the recipient, for the common interest of both the recipient and the declarant, or to protect an interest of the recipient establishes a qualified privilege.").

**17.** We will assume for the sake of argument that the source of the information contained in the letter qualifies as "peer review material[ ]."

**18.** With respect to the letter sent to Menorah Medical Center, again, Nigro did not include any allegation with respect to that letter in his petition. Regardless, Nigro signed a separate release for Menorah Medical Center, and it contained the same language as the Blue Cross release.

**19.** The authorization and release contains a consent clause and a release of liability clause. The former is arguably broader than the latter in that it is not limited to the release of information in good faith. Nevertheless, since we conclude that the letter satisfied the good faith limitation contained in the release clause, we need not address whether St. Joseph and Davis would have been entitled to summary judgment based on the consent clause alone.

tee, or any other such committees," and requested "details for all 'YES' answers on a separate page." The answer to these questions was "yes," and, as requested, the letter included details associated with the "yes" answers.

▪ Furthermore, the letter was written "without malice based on a reasonable belief that the information is true." Malice, in this context, means "actual knowledge of the falsity of the statements or reckless disregard for the truth in making the statements." *Willman v. Dooner*, 770 S.W.2d 275, 281 (Mo.App. W.D.1989). Thus, the fact that the statements in the letter were either true or substantially true satisfies both the "without malice" and the "reasonable belief that the information is true" components of the release Nigro signed.

▪ Moreover, under the circumstances of this case, we hold that a true and accurate report of the committees' findings satisfies the "good faith" contemplated by the authorization and release. In general, good faith requires honesty of purpose, lack of malice, and fidelity to one's duty or obligation. *Dishman v. Joseph*, 14 S.W.3d 709, 717 (Mo.App. W.D. 2000). Under some circumstances, true statements could be deemed to have been given in bad faith if the publisher of the statement omitted material details while having a duty to disclose them. *See Watts*

*v. State*, 206 S.W.3d 413, 417 (Mo.App. S.D.2006) (holding that, under some circumstances, an omission could be deemed a material misrepresentation); *Martin v. McNeill*, 957 S.W.2d 360, 363 (Mo.App. W.D.1997) ("[I]f a party has a duty to speak, silence can amount to misrepresentation.").

▪ Here, Davis was asked by a health insurer whether Nigro had ever been suspended or otherwise subjected to disciplinary proceedings by St. Joseph, and, if he had, to provide details. The purpose of the inquiry was to ensure that Blue Cross had a clear understanding of the medical record of a person who had applied to participate in Blue Cross's network. Under these circumstances, good faith required Davis to respond "yes" and to provide accurate details of what the committees *actually* found and did.[20] Good faith did *not* require Davis to editorialize regarding the accuracy of the committees' findings even if she knew that Nigro contested the findings (which, in any case, her letter made clear through implication) and even if (as Nigro alleges) she personally doubted the accuracy of the findings. Imposing any requirement *other than* providing an accurate summary of what the committees actually found and did would put persons responding to such inquiries in the impossible position of hav-

---

20. As noted above, the letter contained one statement that was substantially true—the letter stated that Nigro *unilaterally asked* for the hearing to be terminated rather than stating that Nigro and St. Joseph *mutually agreed* to terminate the hearing. But the difference between the truth and the substantially true statements Davis wrote is insufficient to justify a finding of malice or bad faith. Nigro has not explained how Davis's seemingly benign statement had a malicious connotation under the facts of this case. Therefore, we hold that the difference between a request to end the hearing and a mutual agreement to end the

hearing did not create a cause of action under the "good faith" clause of the contract.

Nigro also complains that the letter did not make clear that the committees' findings were mere allegations never finalized by the hearing. Again, we think that the letter made clear that Nigro had appealed the findings and that the hearing ended without a final determination: "the Executive Committee lifted the summary suspension and Dr. Nigro withdrew his application for reappointment." Davis did not breach any contractual duty to release information in good faith by making that accurate statement.

ing to explain every nuance of disciplinary proceedings to the applicant's satisfaction.[21] The applicant is obviously better situated to explain his version of events to the insurer or hospital inquiring about his medical record.

In reporting, virtually verbatim, the committees' actions and findings, Davis was (1) responding directly to Blue Cross's inquiry; (2) acting pursuant to a reasonable reading of the authorization and release, and, most importantly, (3) participating in a process that provides an obvious benefit to society, a benefit that arguably would have been undermined by editorializing about the accuracy of the committees' findings. Under these facts, we hold that Davis satisfied the good faith obligation imposed by the authorization and release. Point denied.

## V. Lack of justification

■ Nigro next argues that the circuit court erred in granting summary judgment in that St. Joseph and Davis were not justified in sending the letter. Again, Nigro cites no relevant authority for his point on appeal, but we will exercise our discretion and address the merits. *See Lunceford,* 326 S.W.3d at 62. In doing so, we will assume that this point relates to the tortious interference claim.

■ The elements of a tortious interference claim are: (1) a contract or other valid business expectancy; (2) defendant's knowledge of the expectancy; (3) intentional interference with the expectancy, resulting in the expectancy not being realized; (4) lack of justification; and (5) dam-

ages proximately caused by the defendant's conduct. *Londoff v. Walnut St. Secs., Inc.,* 209 S.W.3d 3, 7 (Mo.App. E.D. 2006). For the reasons stated above, the authorization and release applied to the letter. Our decision on that issue disposes of the "lack of justification" element. Nigro cannot claim that St. Joseph and Davis lacked justification because he authorized the very action of which he complains. Point denied.

## Conclusion

The letter was not defamatory because the statements in it were either true or substantially true. St. Joseph and Davis are not liable for breaching the memorandum of understanding because Nigro released them from any liability associated with sending the letter. For the same reason, St. Joseph and Davis were justified in sending the letter, and therefore they cannot be held liable for tortious interference. Accordingly, we affirm the circuit court's judgment.

CYNTHIA L. MARTIN, Presiding Judge, and THOMAS H. NEWTON, Judge, concur.

---

**21.** If Nigro had wanted pre-approval of *any* report made of the committees' findings, he could have bargained for that right in negotiating the memorandum of understanding. Indeed, he bargained for a similar right with respect to reporting to the National Practitioner Data Bank. With respect to *that* entity, Nigro and St. Joseph agreed that the following would be reported: "The Medical Executive Committee terminated the summary suspension. Dr. T. Lee Nigro's medical staff privileges lapsed." But no such agreement was made with respect to any other entity. We express no opinion regarding whether such an agreement, if made, would be void as against public policy.